CHARLES M. HOWELL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 30097. Promulgated February 16, 1931.

*Daniel V. Howell, Esq.*, and *Charles M. Howell, Esq.*, for the petitioner.

*L. A. Luce, Esq.*, for the respondent.

142

LANSDON: In their contract these stockholders severally agreed "to indemnify the Company * * * against loss, if any" that it might thereafter sustain on account of nonpayment of the loans listed in the schedule attached. The gross indemnity was fixed at $200,000, but the prorated share for which each indemnitor was bound was limited to the ratio his stock ownership bore to the total outstanding stock of the bank on April 25, 1922. The amount which the petitioner was bound to pay was $23,480; and it is his contention that when that amount was paid over to the bank in December, 1922, he *ipso facto* became subrogated, in part, to the rights of the bank as creditor of the several makers of the uncollected notes.

Petitioner's contentions are summarized in his brief thus:

(1) By the payment of $23,480 made by the petitioner under his obligation as guarantor of the several notes, the makers of said notes became and were indebted to the petitioner in said amount.

(2) That each of the debts so owed to the petitioner by the several makers of said notes were worthless in December, 1922, and were so ascertained and determined by said petitioner to be worthless in said year, by reason and virtue of which petitioner charged the same off as a deduction for bad debts in said year and was, accordingly, entitled to take credit for the same as a deduction for bad debts in his income tax return for the year 1922.

It is obvious that the petitioner's basic error lies in the assumption that his contract made him liable as *guarantor* of the several unpaid notes; also, that by reason of his having, in part, paid them, the makers became indebted to him by the amount of the payment. Without attempting the impossible task of determining which, if any, or how many of these notes the petitioner acquired an interest in, in December, 1922, we think it clear that he was never, at any time, guarantor of any of them; neither did his liability to the bank depend upon the payment, either in part or in full, of any of them. The petitioner's contract was one of indemnity and no liability attached, except and until an actual loss had been sustained by the bank. It was, therefore, an original undertaking upon which the petitioner became primarily liable upon the occurrence of the conditions set forth therein. This condition was one of actual loss to the bank, and could not occur, except, and until it had failed to realize enough from the liquidation of the notes to cover its cash outlay on account of them. It had nothing whatever to do with their payment; and, since we do not know the rate of discount, or their cost, we are unable to say whether the bank ever sustained such a loss as

would mature this contract, on account of them. This, therefore, is a very different situation to that of a surety or guarantor who is bound to see that the whole of an obligation, regardless of gain or loss, is paid; and the obligation to pay, in each case, is based upon different legal grounds. In the first instance, the indemnitor is primarily liable on an independent contract and the debt is his own; in the latter case the debt is that of another, which the surety or guarantor pays. *Hall* v. *Equitable Surety Co.*, 126 Ark. 535; 191 S. W. 32; *Osborn* v. *Lawson*, 26 Mo. App. 549; *Foster* v. *Williams*, 144 Mo. App. 219; *Eckhart* v. *Heier*, 37 S. D. 382; 158 S. W. 403; *Assets Realization Co.* v. *Roth*, 226 N. Y. 370; *Keyes* v. *Anderson*, 262 Fed. 748. Where there is no substitution of debtors there can be no legal subrogation. Pomeroy on Equity, 1212; Sheldon on Subrogation, par. 14, 25, 70; *Brown* v. *Sheldon State Bank*, 139 Ia. 83; *Witt* v. *Rice*, 90 Ia. 451; 57 S. W. 951; *Kellog* v. *Colby*, 83 Ia. 513; 49 S. W. 1001; *Bolton* v. *Lambert*, 72 Ia. 483; 34 S. W. 294; *Underwood* v. *Metropolitan National Bank*, 144 U. S. 669.

A number of authorities, including cases decided by the courts and by this Board, have been cited by the petitioner, which he argues support his contentions, but, with the exception of *John P. Dillon*, 9 B. T. A. 177, none of the supporting facts in the cases cited bear any semblance of analogy to these presented here. In the *Dillon* appeal, *supra*, a few of the stockholders of a reorganized bank, who, prior thereto, had guaranteed it against loss in taking over certain assets from an absorbed bank, later, upon pressure from the other stockholders, who refused to share in a prospective loss, effected a compromise in which, by paying into the bank the sum of $100,000 they were released from further obligations under their contract. This loss, being in no way shared by the other stockholders, this Board denied the contention of the Commissioner that it constituted a capital investment and allowed Dillon credit against gross income for the amount he paid, not as a bad debt, but as a loss sustained in the taxable year for which he was not otherwise compensated. In *Morris Sass*, 7 B. T. A. 557, cited by petitioner, the taxpayer had negotiated loans from a bank upon notes which he guaranteed in advance with the knowledge of the several makers. Being later obliged to pay these notes in full, this Board held that the debts survived in favor of the guarantor. In that case, as in all others cited, the doctrine of subrogation was recognized and applied to facts wherein the payor of the debt was the party secondarily liable and in which he had paid the debt of another in full. *E. B. Stephenson*, 13 B. T. A. 311, cited by both parties, involved facts essentially different than these. In that case the stockholders purchased the notes upon which the loss was claimed from the bank and took them out. The ownership of the bad debts was not in issue.

The case at bar involves a group of notes, not one of which is claimed to have been paid, either in part or in whole, with the petitioner's money when it was turned over to the bank in December, 1922. So far as we know, no credits were given by the bank to any of the several makers upon their notes when it received the payment from its stockholders, and the record shows that later, upon payment in full or compromise, some of them were returned to the makers without reference to equities, if any, the indemnitors might assert in or to them. Some, also, were later sold by the bank to the Peoples Security Company for stock which it later sold to these stockholders for cash at par, thus realizing on them in full. The number of such notes and the amount involved in these stock transactions are not shown. The petitioner claims, however, that his payment towards making good the predetermined loss, which it was then known with certainty that the bank must ultimately sustain, entitled him, in law, to be subrogated *pro tanto* to the rights of the bank in and to the whole group without reference to any specific note or its makers. He concedes, however, that the interest thus acquired is subordinate to the prior equities of the bank, and that any action he might have a right to take against the several makers to collect his debt must be held in abeyance until the bank had collected the balance due it.

The contention of the petitioner in respect to such claim is opposed to the basic theory of subrogation, which, in short, means substitution, or, the elimination of the original creditor and the substitution in his place of the payor of the debt. This, of course, can be done only when the whole of the debt is paid, since there can be no partial substitution of creditors, or *pro tanto* subrogation. *Hubbard* v. *Le Barron*, 110 Ia. 443; 81 N. W. 681; *Knew* v. *Duvall*, 45 Md. 501; *McDermott* v. *Mitchell*, 53 Cal. 616; *Fender* v. *Fender* (*Ga.*), 117 S. E. 676; *Olsness* v. *Baird*, 52 N. D. 1; 201 N. W. 993; *Ames* v. *Huse*, 55 Mo. App. 422; *Henry* v. *Safford*, 211 Mo. App. 308; 241 S. W. 951; *Fisher* v. *Columbia Building & Loan Association*, 59 Mo. App. 430; Sheldon on Subrogation, 118, 25 R. C. L. 1319; *McGrath* v. *Carnegie T. Co.* (*N. Y.*), 221 N. Y. 92; *Pa. Co.* v. *Philadelphia Co.*, 266 Fed. 1; *Peoples* v. *Peoples Bros.*, 254 Fed. 489; *U. S. Fidelity & Guaranty Co.* v. *Union Bank & T. Co.*, 228 Fed. 448; *National Surety Co.* v. *Salt Lake Co.*, 5 Fed. (2d) 34; *United States* v. *National Surety Co.* (Mo.), 254 U. S. 73. Subrogation as to a part of a debt payable in installments has been allowed, since each installment, when due, constitutes a separate debt, capable of assignment or release.

Aside from the question of subrogation, or bad debts, the real issue which must control our decision turns upon the question whether, after all, the $23,480 paid by the petitioner to the bank represents a deductible loss. The respondent contends that under

the facts and circumstances shown this payment was a capital investment in the Peoples Trust Company rather than a deductible loss, inasmuch as it was applied in reparation of the bank's surplus and represented only the petitioner's ratable portion of the whole sum paid in. There is much in the record to support the theory thus advanced by the respondent; or, if not that, to indicate that the whole fund of $200,000 paid in by the directors was a donation voluntarily made to offset the impending loss they then knew the bank must ultimately write off. Although they were not ready to concede it at that time, it is inconceivable, in view of the known conditions, that these directors did not know on April 25, 1922, when they signed this indemnity contract, that the bank had already sustained the loss they were then assuming. The Commonwealth National Bank, which was overloaded with cattle-loan paper had failed, and Smith & Ricker was in liquidation. Other banks carrying Smith & Ricker cattle paper were writing off losses on account of it, and the demoralized condition of the cattle industry generally, on account of the slump in prices, had been known for many months. In view of these facts and the further one that the bankable standing of all of these notes was then being preserved only through indulgent continuances, we think the incorrigible optimist denounced in the petitioner's brief would have been sorely taxed to find any substantial value in the bulk of them, and all the more justification for their retention in the bank assets. At this time, respecting obligations, these directors were absolute strangers to these notes. Their act in agreeing to indemnify the bank against loss on account of them was tantamount to a promise to pay at least part of these debts which they did not owe, and for which they could in no way have been held. The voluntary character of their acts in such connection, in the absence of special agreement otherwise, puts them outside of that class of involuntary payors (of other's debts) for whom the law of subrogation gives relief. Apropos to this doctrine, and in direct point, we think, to its application to the situation of these stockholders, Chancellor Johnson, in *Gasden* v. *Brown* (S. Car.), Speers, Eq., 37, 41, said:

The doctrine of subrogation is a pure unmixed equity having its foundation in the principles of natural justice, and from its very nature never could have been intended for the relief of those who were in any condition in which they were at liberty to elect whether they would not be bound; and, so far as I have been able to learn its history, it never has been so applied. *If one with the perfect knowledge of the facts will part with his money, or bind himself by his contract* in a sufficient consideration, any rule of law which would restore him his money or absolve him from his contract would subvert the rules of social order. (Italics supplied.)

The foregoing pronouncement of that doctrine was approved by the Supreme Court of the United States in *Aetna Life Insurance Co.* v.

*Middleport*, 124 U. S. 534, in an opinion written by Mr. Justice Miller, in which he stated that such was " perhaps as clear a statement of the doctrine on this subject as is to be found anywhere." The courts of Missouri have likewise sustained this interpretation. *Wade* v. *Beldmeier*, 40 Mo. 486; *Wolff* v. *Walter*, 56 Mo. 295; *Woodridge* v. *Scott*, 69 Mo. 669; *Price* v. *Courtney*, 87 Mo. 387; *Bunn* v. *Lindsey*, 95 Mo. 250; *Kleinman* v. *Geiselmann*, 114 Mo. 437; *Grady* v. *O'Reily*, 116 Mo. 346; *Capen* v. *Garrison*, 193 Mo. 335; *Foster* v. *Williams*, 144 Mo. A. 219; *Jacobs* v. *Webster*, 199 Mo. A. 604.

At the time the stockholders' fund of $200,000 was turned over to the bank in December, 1922, there was a determined loss to it in that amount, caused by shrinkage in value of capital assets. This payment repaired that loss and, at the same time, increased the value, pro rata, of every share of its capital stock. It would seem, therefore, that in repairing this loss the petitioner's stock in the Peoples Trust Company was enhanced in value by the exact amount he paid into the fund and it is difficult to see wherein he sustained any loss in the transaction. *Snider B. Ward*, 18 B. T. A. 326. The fact that these stockholders chose to make their contributions under an agreement, rather than in response to formal assessments against themselves, as was done in the *John C. Paxton* case, 7 B. T. A. 92, does not change the character of their transaction, nor their legal status in the premises. Since we have previously decided that a director of a corporation is not engaged in the business of the corporation (*Margaret B. McLaughlin, Executrix*, 12 B. T. A. 19), there is no basis for allowing the deduction here claimed as a loss sustained in a trade or business. We are of opinion that the respondent correctly rejected the claimed deduction and his action is therefore approved.

*Decision will be entered for the respondent.*