Philip W. Fitzpatrick and Kathleen S. Fitzpatrick v. Commissioner.
Fitzpatrick v. Commissioner
Docket No. 5309-64.
United States Tax Court
T.C. Memo 1967-1; 1967 Tax Ct. Memo LEXIS 260; 26 T.C.M. (CCH) 1; T.C.M. (RIA) 67001; January 5, 1967
*260 Held, petitioner's payment in discharge of his obligation as coguarantor gave rise to a business bad debt inasmuch as the guaranty was proximately related to his trade or business, that of rendering services for pay. Philip W. Fitzpatrick, Anchor Bldg., St. Paul, Minn., for the petitioners. Robert F. Cunningham, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in petitioners' Federal *261 income taxes for the years 1961 and 1962 in the amounts of $22.86 and $1,435.89, respectively. The only issue for determination is whether the amount of $12,186.53 paid by petitioner Philip W. Fitzpatrick in 1962 as a coguarantor on a corporate obligation was deductible as a business or as a nonbusiness bad debt. The other adjustments made in the notice of deficiency with respect to 1961 and 1962 will be decided by a determination of the issue set forth above. Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Philip W. Fitzpatrick (hereinafter referred to as petitioner) and Kathleen S. Fitzpatrick, husband and wife, are residents of St. Paul, Minnesota. They filed their joint Federal income tax returns for the years 1961 and 1962 on the cash basis with the district director of internal revenue for the District of Minnesota. Prior to 1952, petitioner was employed as president of West Virginia Coal and Transportation Company. [1] Upon its takeover early in 1952 by the Truax Traer Coal Company of Chicago, his connection with the corporation was terminated *262 and petitioner was then unemployed. In November of 1952, a group of individuals, including petitioner, organized the PTC Cable Company (hereinafter referred to as PTC) for the principal purpose of engaging in engineering research. PTC developed and marketed a temperature-indicating device employed in a wire rope. This device was designed to measure temperature of stored commodities and, later, petroleum products. The original authorized capital of PTC consisted of 6,000 shares of stock at 20" par and $30,000 in Subordinated Certificates of Indebtedness. Of this original authorization, petitioner held 900 shares of stock (total investment $180) and $7,500 in certificates of indebtedness. His percentage investment was 15 percent of the authorized and outstanding stock and 25 percent of the authorized and outstanding debt. Petitioner's total monetary investment in PTC was $7,680. In addition to being a stockholder and creditor of PTC, petitioner was a member of the Board of Directors and was employed by the corporation in the position of vicepresident *263 in charge of administration. In this latter position, petitioner received a salary of $500 per month which was increased to $1,000 per month in March 1954 when he began to devote his full attention to his position as a corporate officer. By February of 1955, PTC was in need of further financial assistance. It had pledged substantially all of its accounts receivable as collateral for existing loans. It was also without existing authorization under the corporate charter and by-laws to issue additional stock or debt. In order to meet its payroll, it became necessary for PTC to seek additional loans. In February, the First National Bank of Saint Paul (hereinafter referred to as the bank) granted a 30-day loan in the amount of $15,000 to PTC upon the verbal assurances of both petitioner and one W.J. O'Brien, a director of PTC, that the loan would be repaid. A promissory note dated February 11, 1955, was executed by PTC as evidence of its indebtedness. On March 14, 1955, the loan was increased to $20,000 and on March 30, 1955, an additional $5,000 loan was granted PTC for which it executed a separate promissory note. The same oral personal guaranties were given by petitioner and O'Brien *264 for each renewal of these notes for the balance of the year 1955. Petitioner agreed to act as co-guarantor because, at that time, he was greatly concerned that if PTC was forced to cease operations he would not be able to secure regular employment as a corporate executive because of his age. His dominant motive was not to protect his then relatively minor monetary investment in PTC. At the time of the original guaranties, petitioner was 59 years of age. At the end of the year 1955, the bank requested that these oral guaranties be replaced by the personal endorsements of the guarantors on all subsequent renewals of the notes. At this time Charles H. Bigelow, a PTC director, was substituted as coguarantor for O'Brien. The requested personal endorsements were given and the notes were renewed continuously until the end of the year 1960. At no time material herein was petitioner required as a condition of his employment to give his personal guaranty, either oral or by endorsement, on these notes or the renewals thereof. Nor was petitioner actively engaged at this time in the business of guarantying business loans generally. During the summer of 1955, pursuant to an authorization for *265 the issuance of additional stock and debt, petitioner invested additional sums in stock and debt of PTC, thereby increasing his total investment in the corporation to approximately $10,200. In 1956, PTC began to develop new products. In that same year it was discovered that PTC's president had been embezzling funds from the corporation and had surreptitiously applied for a patent in his own name for the newly developed products. The development of these new products and the prosecution of the corporation's protracted lawsuit against the president led petitioner to invest substantial additional amounts in PTC during the years 1956 through 1960. Petitioner's total investment in the corporation eventually exceeded $240,000. From December 1, 1956, until the demise of the corporation, petitioner voluntarily suspended the actual payment of his own salary. A memorandum salary of $100 was noted on the books of PTC to enable the corporation to account for hospitalization and fringe benefit deductions. For this entire period petitioner's salary accrued but was never paid. Because the corporation was continuing almost solely on the strength of his additional investments, petitioner did not *266 see any reason to invest additional sums to pay his own salary. On or about March 31, 1960, PTC ceased business operations and subsequent to this date its officers attempted to close the accounts receivable and to sell the business. This latter attempt proved futile. On November 18, 1960, PTC authorized the bank to apply the balance of its checking account in the amount of $1,033.50 against its indebtedness of $25,000. The bank did so, and on December 28, 1960, PTC executed a promissory note for the balance of $23,966.50. This note was renewed on June 28, 1961, and again on September 26, 1961. On December 18, 1961, the bank demanded payment at the maturity date, December 27, 1961. At the time the demand was made, PTC was insolvent and unable to pay the indebtedness. On January 10, 1962, petitioner paid the bank one-half of the principal amount of the note plus one-half of the accrued interest, a total of $12,186.53, in discharge of his obligation as coguarantor. The balance was paid on that same day by Bigelow. At the time these payments were made PTC was insolvent. During the years 1961 and 1962 petitioner was temporarily employed by the Port Authority of the City of St. Paul, *267 in an executive capacity, at an annual salary of approximately $12,000. Opinion The sole issue is whether the amount of $12,186.53, paid by petitioner as a coguarantor of the corporate debt, gave rise to a business or nonbusiness bad debt deduction. It is well settled that a bad debt deduction is allowable to the guarantor of a debt in the year of payment if his subrogation rights against the primary debtor are worthless. Howell v. Commissioner, 69 F. 2d 447 (C.A. 8, 1934), affirming 22 B.T.A. 140 (1931), certiorari denied 292 U.S. 654 (1934). The Commissioner has conceded, and we have found that in 1962, the year of payment, the corporation, PTC, was insolvent and unable to pay its debts so that petitioner's subrogation rights were worthless in that year. Petitioner contends that he was in the trade or business of rendering services for pay and that the loss, arising out of the guaranty, was incurred in connection with and proximately related to this trade or business. He concludes the the bad debt is a business bad debt deductible under section 166(a) (1) of the Internal Revenue Code *268 of 1954. [2] Respondent, on the other hand, maintains that the petitioner has incurred a nonbusiness bad debt resulting in a short-term capital loss pursuant to section 166(d). [3]
*269 We agree with petitioner when he states that he was carrying on a trade or business, that of rendering services for pay, within the meaning of the statute by virtue of his position as vice-president of PTC. See George P. Weddle, 39 T.C. 493 (1962), affd. 325 F. 2d 849 (C.A. 2, 1963). At the time he guarantied the note, [4] he was devoting his full time to the affairs of the corporation in return for which he received an annual salary of $12,000. However, a finding that petitioner was engaged in a trade or business is not per se sufficient to make the debt in question deductible as a business bad debt under section 166(a). The debt must be proximately related to that trade or business before it can be considered a business bad debt. Kelly v. Patterson, 331 F. 2d 753 (C.A. 5, 1964); George P. Weddle, supra. *270 Petitioner was both an employee and an investor in PTC. He had the burden of showing that his dominant motive in guarantying the corporate loan was in connection with or proximately related to his business of being a salaried employee, rather than to his status as investor. Eugene H. Rietzke, 40 T.C. 443 (1963); George P. Weddle, supra. We hold that petitioner has successfully met this burden. The relevant portions of the record reveal that at the time petitioner made the guaranty his total investment in both the stock and debt of PTC was $7,680. He was also employed by the corporation at an annual salary of $12,000. Petitioner, was, at this time, 59 years of age. He testified that: I was made the vice-president in charge of administration. In February and March of 1955 the company had no funds with which to meet its payrolls, and it was obliged to borrow from the bank in order to remain in business. I was greatly concerned at that time that my salary and employment be continued as on account of my age which was 59 it would have been most difficult for me to obtain regular employment in my line of work elsewhere. My motive in agreeing to guarantee *271 the otherwise unsecured borrowings from the bank was exclusively to insure my continued employment at $12,000 per year, and no specific concern was given by me in performing that act to the relatively minor investment I had in the securities of the PTC Cable Company that amounted to $7,680. Respondent did not attempt to directly challenge petitioner's testimony but, instead, relied heavily on the events of the period 1956 through 1960. During this period petitioner increased his investment in the corporation to a final amount in excess of $240,000, and in addition voluntarily suspended his annual salary. However, because these events occurred after the date on which petitioner guarantied the loans and, more importantly, because they were actions in response to a set of circumstances which were unknown to him at the date the guaranty was given, they are irrelevant to the issue of petitioner's dominant motive in making the guaranty. The discovery of embezzlement and misappropriation of a patent application by the then president of PTC was the motivating factor in causing petitioner to substantially increase his investment. Petitioner admitted that at this time his prime concern became *272 the protection of all the investors in PTC. Since the embezzlement was not discovered until the summer of 1956, it can have no relevance to the discerning of petitioner's dominant motive in guarantying a loan in February of 1955. The same may be said of the voluntary suspension of petitioner's salary in December of 1956, at which time the corporation was being run almost exclusively on petitioner's additional investments. Respondent finally attempts to indirectly challenge petitioner's assertion that his primary motive was the protection of his status as an employee by pointing out that, after the eventual failure of PTC in 1961, when petitioner was about 65 years of age, he was able to find temporary employment with the Port Authority of the City of St. Paul at an annual salary of $12,000. Respondent would have us infer from this that employment was not a problem for petitioner even considering his age and that his guaranty could not have been motivated by a desire to preserve his employment with PTC, as petitioner alleged. We cannot agree. We are unable to discern any logical connection between this temporary employment during 1961 and 1962 and the conclusion urged by respondent *273 that in 1955 petitioner was not concerned about maintaining his active employment with PTC. In the cases relied on by respondent, the crucial factor that resulted in a conclusion that the loss was a nonbusiness bad debt was a finding that the petitioners therein were primarily concerned with protecting their investments. See Eugene H. Rietzke and George P. Weddle, both supra. Here, as we have found, petitioner's dominant motive in coguarantying the loan was not to protect his then relatively minor investment but was, rather, to maintain his employment. [5] Respondent's cases are, therefore, distinguishable on their facts. Our inquiry, in cases of this nature, where petitioner wears two hats, that of employee and that of shareholder, as we stated in George P. Weddle, supra, at 496, "is to determine what hat petitioner wore the day * * * [he guarantied] the corporate notes." On the basis of the facts before us, it is our opinion that he wore the former, that of employee.
*274 In summary, therefore, based on petitioner's highly credible and wholly convincing testimony as to his motive and his refutation on cross-examination of respondent's attempted inferences, we are of the opinion that petitioner's dominant motive was, as he stated, to maintain his status as a salaried employee. It was not, as respondent urges, to protect his position as an investor. Therefore, on the particular facts before us the guaranty arose in connection with and was proximately related to his trade or business, that of rendering services for pay. Respondent's contention that the case of Trent v. Commissioner, 291 F. 2d 669 (C.A. 2, 1961), reversing 34 T.C. 910 (1960), allows a finding of a business bad debt only if the guaranty is formally required as a condition of employment is without merit. Though that was the situation before the Second Circuit in Trent, the Court of Appeals, in its opinion, held that this was merely one instance in which it could be said that the guaranty was proximately related to the trade or business of rendering services for pay. See Trent v. Commissioner, supra, at pp. 675, 676. [6]
*275 Decision will be entered under Rule 50. Footnotes
1. From the end of World War I until this time, petitioner had been continuously employed by various corporations in different positions.↩
2. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. ↩
3. SEC. 166(d). Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - * * *
(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
4. On brief, respondent has conceded that the bad debt which petitioner has sustained, relates back to petitioner's guaranty of February 1955. In doing so, he has apparently also conceded that this guaranty created an enforceable obligation on the petitioner.↩
5. This Court has often held that the presence of a relatively minor capital investment does not preclude a finding that a shareholder's loan to the corporation, when it becomes worthless, may constitute a business bad debt. See R. B. Cowden, 34 T.C. 819 (1960), (approximately a 20 percent shareholder); J. T. Dorminey, 26 T.C. 940 (1956) (major shareholder); Tony Martin, 25 T.C. 94 (1955) (25 percent shareholder); and Stuart Bart, 21 T.C. 880↩ (1954) (minority shareholder). It should be noted that, in the case at bar, petitioner was a 15 percent shareholder in addition to owning 25 percent of the certificates of indebtedness at the time he acted as coguarantor of the corporate loan.
6. Though the problem in Trent v. Commissioner, 291 F. 2d 669 (C.A. 2, 1961), reversing 34 T.C. 910 (1960) has never been squarely before the Supreme Court, that Court, in the case of Whipple v. Commissioner, 373 U.S. 193 (1963), cited Trent for the proposition that, in order to show a business bad debt, petitioner must furnish proof "that the loan was necessary to keep his job or was otherwise proximately related to maintaining his trade or business as an employee." (Emphasis supplied) Whipple v. Commissioner, supra, at 204↩. The Court in the Whipple case stated that there was no need to consider the Trent case because on the record before them it had not been shown that the petitioner was a salaried employee and additionally because petitioner had not raised any such claim in either the Tax Court or the Court of Appeals.