CHARLES E. (PAT) BOONE and SHIRLEY BOONE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Boone v. Commissioner
Docket No. 4318-71.
United States Tax Court
T.C. Memo 1974-152; 1974 Tax Ct. Memo LEXIS 168; 33 T.C.M. (CCH) 663; T.C.M. (RIA) 74152; June 12, 1974, Filed Robert S. West, Mark D. Pastor, and Robert I. Rosenberg, for the petitioners. Earl Goldhammer, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent has determined deficiencies in the Federal income tax of petitioners for the years 1965 and 1966 in the amounts of $28,514.42 and $24,246.38, respectively. Certain concessions having been made by the parties, the sole question remaining for our decision is whether in 1965 and 1966 petitioner husband is entitled to deduct as an ordinary and necessary business expense under section 162(a)[1] or, alternatively, as a loss under section 165(c) (2), the voluntary and gratuitous surrender of certain debentures to a corporation in which he was an 18.5 percent shareholder. FINDINGS OF FACT Some of the facts have been stipulated. Such stipulations *170 and the exhibits attached thereto are incorporated herein by this reference. Charles E. (Pat) Boone (hereinafter referred to as "Pat") and Shirley Boone are husband and wife whose legal residence at the time the petition was filed herein was Los Angeles, California. Petitioner filed joint Federal income tax returns for the taxable years 1965 and 1966 with the district director of internal revenue, Los Angeles, California. [2]
From 1955 up to the present time, petitioner's principal occupation, for which he is both nationally and internationally known, has been that of a public entertainer. He has also been an endorser of numerous commercial products. During his entertainment career, petitioner has performed as a singer, a recording artist, a movie actor, a national radio and television personality, and a night club entertainer. [3]
*171 Early in his career, he became "a regular" on the Arthur Godfrey show. Subsequently, he went on to have his own evening television show.Throughout this period, he was working his way through Columbia University. As a result of his frequent appearances on television and in the movies, where he would inevitably play the role of the all-American boy, petitioner established a reputation in the public eye as an honest, wholesome, and religious young man. In September 1962, petitioner was one of ten original incorporators and shareholders of Desert Carmel Development Corp. (hereinafter referred to as "Desert"), an Arizona corporation, formed for the principal purpose of subdividing, developing, and selling real property in Arizona. The property in question covered an area of approximately 3,080 acres and was located just outside Casa Grande, midway between Phoenix and Tucson. The San Francisco baseball Giants' spring training camp was directly adjacent to the property. From the inception of Desert and throughout the years in question, petitioner was its president and a member of its board of directors. Of the 20,000 shares of common voting stock of Desert, par value $10, issued *172 and outstanding during the years in question, petitioner owned 3,700 or 18.5 percent, having a cost basis of $37,000. In addition, petitioner held debenture bonds of Desert, having a total face amount of $90,500, and evidencing loans made by him to Desert between September 1962 and January 1965. [4] In 1966, petitioner accepted from one of the original incorporators of Desert an additional debenture bond in the face amount of $20,000, bearing interest at 8 percent per annum and due on September 1, 1970, as payment for an indebtedness owing in the amount of $20,000. In February 1964, Desert formally instituted a marketing and sales campaign to sell the parcel lots on its Casa Grande property. It was the intent of Desert to use the name and reputation of petitioner to bolster the credibility and reliability of the project to prospective *173 purchasers. As part of Desert's sales program, which was run by a land development firm brought in from the outside, petitioner was portrayed as the project's president and prime mover. The project itself was billed as "Pat Boone's Desert Carmel." Petitioner made radio commercials, appeared in film strips, movies and slides, made endorsements in newspaper ads, and appeared on a large billboard advertisement at the property site welcoming prospective purchasers to the Desert development project. By 1965, these marketing and advertising activities were carried out on a national basis with petitioner's name being inextricably connected with the Casa Grande development. The price range of a single parcel lot was generally between $4,000 to $5,000. A down payment of 10 percent was required. Most of the purchasers were persons of modest means, wage earners, small business operators, and senior citizens desiring a retirement home. Policies of title insurance were sent to each new Desert land purchaser, accompanied by a letter of welcome indicating that Desert was a project of petitioner and bearing the facsimile of petitioner's signature as president of Desert. During the years *174 in question, Desert suffered from a severe lack of working capital. Desert's assets and liabilities as reflected on its balance sheets for the fiscal years ending June 30, 1965 and June 30, 1966 are reflected below in summary form: BALANCE SHEETS OF DESERT FOR FISCAL YEARS ENDING JUNE 30, 1965 AND JUNE 30, 1966
ASSETS
Current Assets:
Cash
$ 18,676.09
$ 21,840.68
Accounts and Contracts Receivable
73,290.69
125,752.00
Inventory - Land Held For Sale
274,031.74
402,750.33
Model Homes
104,188.46
17,361.62
Prepaid Interest 4,363.00
5,289.00
Total Current Assets
$ 474,549.98
$ 572,993.63
Fixed Assets:
Buildings
22,116.00
22,116.00
Less: Accu. Depreciation
(12,531.00)
(16,953.00)
Miscellaneous Fixed Assets
113,273.23
149,884.03
Less: Accu. Depreciation
(47,258.00)
(69,344.76)
Other Assets:
Long-Term Receivables
457,782.05
1,455,813.25
Land Held for Future Development
1,216,292.51
1,004,601.09
Accounts Receivable - Desert Carmel Service Company
168,125.01
229,046.43
Miscellaneous 13,500.00
35,200.00
Total Assets $2,405,849.78
$3,383,356.67
LIABILITIES
Current Liabilities:
Accounts and Notes Payable
$ 612,815.84
$1,530,738.47
Contracts and Mortgages Payable
584,282.19
193,660.46
Interest and Commissions Payable
88,892.48
174,145.26
Miscellaneous Current Liabilities 6,121.56
398.99
Total Current Liabilities
$1,292,112.07
$1,898,943.18
Long-Term Liabilities:
Mortgages and Contracts Payable
626,050.83
564,578.03
8% Subordinated Debentures
440,000.00
390,000.00
Deferred Development Costs
130,148.92
431,875.15
Debenture Interest Payable
78,342.16
109,542.16
Miscellaneous Liabilities 18,179.88
38,747.84
Total Liabilities
$2,584,833.86
$3,433,686.36
CAPITAL
Contributed Capital:
675,000 shares (par value $10) authorized, 20,000 shares issued and outstanding
200,000.00
200,000.00
Donated Capital
50,000.00
Retained Earnings (378,984.08)
(300,329.69)
Total Capital
(178,984.08)
(50,329.69)
TOTAL LIABILITIES AND CAPITAL $2,405,849.78
3,383.356.67
*175 Desert's liquidity problems stemmed from two interrelated factors. First, the volume of sales did not measure up to expectations. As of the fiscal year ending June 30, 1965, Desert had only sold 274 parcel lots. The volume of sales improved materially the following year as a result of Desert employing a new land development firm, but the problem of obtaining adequate working capital persisted. Secondly, in conjunction with the insufficient amount of sales, under the contract of sale there was a considerable time lag between the date that the purchaser entered into the transaction and the date of payment of a substantial part of the purchase price. The initial down payment, from which the salesmen's commissions had to be deducted, was inadequate to produce the required cash flow to meet current needs. Throughout this period, Ben B. Cheney (hereinafter referred to as "Cheney"), one of Desert's original incorporators and principal financial backer, provided the funds and credit necessary for its operations. Cheney was a successful and wealthy businessman who made his fortune in the lumber business in the State of Washington. During 1965 and 1966, Cheney was a shareholder, *176 director, and acting vice president of Desert. [5]
Cheney personally lent Desert $520,000 evidenced by promissory notes, which sum became due in various installments during 1965 but which was not paid at that time. He granted a second mortgage upon his real property to the Bank of Tucson in the amount of $50,000 as security for a loan from the bank to Desert. When Desert defaulted on a promissory note in the face amount of $60,000 owing to National Bank of Washington, Tacoma, on October 18, 1965, her personally guaranteed payment on the note to avoid threatened legal action. In addition to his actions on behalf of Desert in making direct loans, quaranteeing loans by outside creditors, and permitting his own property to be used as security by Desert for other loans, Cheney provided the necessary leadership to Desert in negotiating and obtaining financing. In 1965, Cheney, sensing that Desert's affairs were being mishandled, required that some of the shareholders put their stock into voting trusts in return for his continued support. He was also responsible for bringing *177 in a new land development firm from his home State of Washington in December of 1965 to take over management of Desert's sales program. During 1965 and 1966, the petitioner was concerned that Cheney might lost interest in Desert. On several occasions, Cheney had voiced his objections to petitioner and the other shareholders in Desert about his role of having to provide a disproportionate amount of the financing. He wanted the other shareholders to either furnish more funds or obtain a sufficient line of credit for Desert's needs. Petitioner was especially fearful that Cheney might cut his losses and run. If Cheney withdrew his financial support from Desert, petitioner was convinced that the whole project would collapse and hundreds of purchasers would suffer losses. Petitioner feared he would then be subject to adverse publicity, including possible charges of fraud on account of his being so closely connected with Desert as its president and also having his name and image used in the company's nationwide advertising and marketing programs. Petitioner was concerned that such adverse publicity might seriously impair his public image and reputation and thereby jeopardize or *178 destroy his career as a public entertainer and endorser of commercial products. In December of 1965, petitioner unconditionally surrendered to Desert debenture bonds in the face amount of $50,000. In a letter dated December 28, 1965, to the Board of Directors of Desert advising them of his decision to surrender debenture bonds in the face amount of $50,000, however, petitioner specifically stated that his action "should not in any way be considered as a request that the other bondholders similarly voluntarily and without consideration surrender their bonds." None of the other bondholders of Desert surrendered any of their debentures to the corporation. On its financial statement for the fiscal year ending June 30, 1966, Desert reported petitioner's surrender of debentures as "donated capital." In December of 1966, petitioner surrendered additional debenture bonds in the face amount of $42,500. There was never any agreement or understanding between petitioner and Cheney with respect to the surrender by petitioner of the bonds. No effort was made by petitioner to obtain any assurances from Cheney. In the latter part of 1967, all of the issued and outstanding common *179 stock of Desert was acquired by a third party at cost to the selling shareholders. The acquiring third party also assumed Desert's liability on all the outstanding debenture bonds. On his joint income tax returns for 1965 and 1966, petitioner deducted $50,000 and $42,500, respectively, as miscellaneous deductions. Petitioner's taxable income, computed without regard to the deduction of said sums of $50,000 and $42,500, respectively, amounted to $100,157.73 for the taxable year 1965 and $119,901.29 for the taxable year 1966. On a separate schedule attached to each return, petitioner stated that these deductions were taken as a loss sustained upon the surrender of bonds. Petitioner did not deduct the losses on the Schedule C filed by him for both 1965 and 1966. Respondent has disallowed the claimed deductions on the grounds that petitioner's surrender of debenture bonds constituted a contribution to the capital of Desert and as such should be added to the basis of petitioner's stock. OPINION Petitioner is a nationally and internationally known singing, movie, and television celebrity. Prior to 1965, he had recorded no less than 13 songs which had won the Gold Record award, *180 symbolic of having sold more than one million copies of a particular record. He had also been an endorser of numberous commercial products. During 1965 and 1966, petitioner was the president, a director, and a 18.5 percent shareholder in Desert, an Arizona development corporation engaged in the subdivision and sale of parcel lots on a tract of land located midway between Phoenix and Tucson, Arizona. Petitioner was also a creditor of the corporation, holding debenture bonds in the face amount of $90,500 evidencing loans made by him to the corporation since its formation in 1962. He acquired additional debenture bonds in the face amount of $20,000 from a co-shareholder of Desert in cancellation of an existing personal obligation. During 1965 and 1966, Desert was experiencing severe liquidity problems as a result of not having sufficient working capital to meet its current needs. One of Desert's original incorporators and principal financial backers, Ben Cheney, had made loans to Desert totaling $520,000 and had also guaranteed loans by outside creditors and permitted some of his own property to be used as security by Desert for other loans. Petitioner foresaw the risk that *181 Cheney might withdraw his financial support and the corporation would be bankrupt. In December of 1965, petitioner surrendered to Desert debenture bonds in the face amount of $50,000. In December of the following year, he surrendered additional debenture bonds in the face amount of $42,500. Petitioner maintains that he is entitled to deduct the face amounts of these bonds on his returns for 1965 and 1966 as an ordinary and necessary business expense under section 162. [6] In the alternative, petitioner maintains that such amounts should be allowable as losses under section 165(c) (2). Respondent, on the other hand, contends that section 1.62-12(a), Income Tax Regs., characterizes any cancellation of indebtedness to a corporation by a shareholder-creditor as a contribution *182 to its capital and, as such, is not deductible under any theory, citing Lidgerwood Mfg. Co. v. Commissioner, 229 F.2d 241 (C.A. 2, 1956). See also Perlman v. Commissioner, 252 F.2d 890 (C.A. 2, 1958), affirming 27 T.C. 755 (1957). On this basis, the respondent further contends that the face amount of the indebtedness must be added to the basis of the petitioner's stock in Desert. Petitioner claims that his primary motive in surrendering the bonds was to protect his business reputation as an entertainer and an endorser of commercial products, which he felt was directly related to the survival of Desert. The corporation had used his name to sell its parcel lots, and if it failed, he was of the opinion that his name would be irretrievably tarnished. The financial condition of Desert in December 1965 is not subject to question. The corporation was unable to meet its obligations and had defaulted on a promissory note in the face amount of $60,000. Without a further contribution either of cash or credit on the part of Cheney, either alone or in conjunction with its other shareholders, the corporation faced bankruptcy. However, the record *183 belies the claim that petitioner's primary purpose or motivation in the surrender of his debentures was to preserve his reputation in the entertainment field. The surrender by the petitioner of the bonds did not alleviate Desert's requirements for working capital. Its only effect was to improve the debt-equity ratio and that effect was insignificant in amount. Thus the actions taken by the petitioner would significantly improve the financial condition of Desert only if petitioner's actions induced other shareholder-creditors to do likewise. Before making a contribution on his part the petitioner would be expected to obtain some assurance of financial support from either Cheney or his associates. The petitioner obtained no such assurances. In the hands of the petitioner both the bonds and the stock of Desert were capital assets. If Desert was unable to meet its obligations, the petitioner would be faced with a loss on account of either the worthlessness or the sale or other disposition of such assets which would be subject to the limitations provided for by the statute with respect to capital losses. [7] As a practical matter, the tax deduction sought by the petitioner was worth *184 more to him than would be a loss on account of the worthlessness of the bonds. The petitioner was thus faced with the opportunity to recoup a part of his loss and, at the same time by his unselfish act, diminish the damage to his reputation which might result in the event of the failure of Desert to meet its obligations. While the petitioner may have had a dual purpose in surrendering the bonds, when we look to the record as a whole, the conclusion is inescapable that tax savings was the primary motive in making a contribution to the capital of Desert and that concern with respect to the petitioner's business reputation as an entertainer was only a secondary consideration. The action taken by the petitioner in surrendering the bonds, while it may have pleased Cheney, was clearly designed primarily to salvage a deduction against ordinary income for tax purposes out of what appeared to be an impending capital loss. Petitioner's taxable income, without regard to the deductions in issue, was $100,157.73 and *185 $119,901.29, respectively, for the years in question.By spreading the claimed deductions over a 2-year period, petitioner was able to offset income which otherwise would be taxed in the higher tax brackets. Irrespective of any other considerations the contribution by the petitioner was split approximately one-half in 1965 and approximately one-half in 1966 to maximize the tax savings. The Court is thus convinced that the petitioner's motivation in making a contribution of bonds to Desert stemmed primarily from tax considerations. We must, therefore, look to the transaction objectively in the light of its effect both with respect to the petitioner and with respect to the corporation. As such, it was a "capital" transaction. The petitioner made a contribution in the form of the surrender of indebtedness to a corporation in which he was a major shareholder. As a general rule, such contributions do not give rise either to deductible losses or business expenses. The face amount of the indebtedness is added to the basis of petitioner's stock in Desert.Perlman v. Commissioner, supra. [8] *186 In this respect, the forgiveness of indebtedness or a contribution of cash to a corporation differs from a contribution of its stock. Thus in J. K. Downer, 48 T.C. 86, 90 (1967), this Court said: If a cash payment had been involved herein, there is no question that petitioner would have been held to have made a capital contribution to the corporation and he would not have been entitled to any loss. The cases deny a deduction under such circumstances whether or not the payment flowed directly to the corporation or to a third party for the benefit of the corporation and whether each stockholder participated *187 proportionately or disproportionately in the payment. Wohl v. United States, 267 F.2d 605 (C.A. 5, 1959); H. William Ihrig, 26 T.C. 73 (1956); Irving S. Sokol, 25 T.C. 1134 (1956); Harry Sackstein, 14 T.C. 566 (1950); Eskimo Pie Corporation, 4 T.C. 669 (1945), affirmed per curiam 153 F.2d 301 (C.A. 3, 1946); Michigan Central Railroad Co., 28 B.T.A. 437 (1933) (issue I); reversed on other issues sub nom. New York Cent. R. Co. v. Commissioner, 79 F.2d 247 (C.A. 2, 1935); W. F. Bavinger, 22 B.T.A. 1239 (1931); Charles M. Howell, 22 B.T.A. 140 (1931), appeal dismissed 69 F.2d 447 (C.A. 8, 1934). Our characterization of petitioner's surrender of his debenture bonds as a contribution to capital similarly precludes any claim for deduction under section 165(c) (2). Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. Shirley Boone is a petitioner herein only by virtue of having filed a joint income tax return with her husband, Pat. Further references to petitioner herein will therefore only refer to Pat. ↩
3. Prior to 1965, petitioner received Gold Records for 13 of his hit songs. A Gold Record is symbolic of having sold more than one million copies of a particular record. ↩
4. Petitioner made loans to Desert in the amounts of $37,500, $18,000, and $35,000. The first two loans were evidenced by debenture bonds in the face amount of the loan, bearing interest at 8 percent and due September 1, 1970. The latter loan was evidenced by a convertible debenture bond, bearing interest at 8 percent and due April 15, 1972. ↩
5. At the time, he was also a major stockholder in the San Francisco Giants professional baseball team. ↩
6. Under this theory, any amount otherwise allowable as a business expense presumably would be limited to the value of the property contributed, namely, the bonds. Since the petitioner testified that his primary concern was whether Desert would be able to meet its obligations, such value was highly speculative. However, the parties did not address themselves to this issue. ↩
7. Whether the bonds came within the definition of securities under sec. 165(g)↩ or a nonbusiness bad debt under sec. 166(d), if worthless, the result would be the same. 8. The case of Samuel R. Milbank, 51 T.C. 805↩ (1969), relied on by the petitioner, is clearly distinguishable. In the Milbank case, this court found that the loans made by the taxpayer to his defunct corporation and the repayment of certain defaulted loans of that corporation were related proximately to the taxpayer's business as an investment banker. In the case now before the Court, there was no proximate relationship between the investment by the petitioner in the land development company and the petitioner's business as an entertainer.