HELENE BALDWIN BURDICK, EXECUTRIX, ESTATE OF JULIAN BURDICK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 21065. Promulgated September 10, 1930.

*W. A. Seifert, Esq., W. W. Booth, Esq.,* and *A. G. Wallerstadt, C. P. A.,* for the petitioner.

*Eugene Meacham, Esq.,* and *C. E. Lowery, Esq.,* for the respondent.

OPINION.

BLACK: The petitioner claims that Julian Burdick, decedent, sustained a loss in the year 1923 of $78,372.06 computed in the manner set out in our findings of fact. Petitioner bases his claim for the deduction under section 214(a) (5), Revenue Act of 1921. The Commissioner of Internal Revenue, respondent, refused to allow the loss, on the ground that the transaction was a reorganization or recapitalization of the Marf Machine & Die Casting Co., under section 202(c) (2) of the Revenue Act of 1921.

Section 202(c) (2) of that Act reads:

(c) For the purpose of this title, on an exchange of property, real, personal, or mixed, for any other such property, no gain or loss shall be recognized unless the property received in exchange has a readily realizable market value; but even if the property received in exchange has a readily realizable market value, no gain or loss shall be recognized.

\* \* \* \* \* \* \*

(2) When in the reorganization of one or more corporations, a person receives in place of any stock or securities owned by him, stock or securities in a corporation a party to or resulting from such reorganization. The word "reorganization" as used in this paragraph, includes a merger or consolidation \* \* \* recapitalization or mere change in identity, form or place of organization of a corporation (however effected).

Under the facts in evidence in this proceeding we hold that there was no reorganization of the Marf Machine & Die Casting Co. within the meaning of the section just quoted. The agreement in evidence in this proceeding shows a transaction between stockholders of the company and one Louis C. Kunz. The corporation was not a party to the transaction. The company continued to function after the transaction the same as before. The stock deposited under the terms of the agreement, to change hands, was not deposited *with* the corporation *for* the corporation. It was deposited with the Guaranty Trust Co. as trustee for the benefit of the *parties* signing the agreement and to be administered in accordance with the terms of the agreement. There was no change in the corporation's capital structure until after the transaction was completed. True, there was a redistribution of the 1,900 shares of common stock and 600 shares of preferred stock, deposited under the terms of the agreement. When the negotiations were completed and the Guaranty Trust Co. had carried out its terms, Julian Burdick was in possession of only 159 shares of common stock of the corporation, but it was not new stock. It was 159 shares of identically the same stock he had delivered in escrow to the Guaranty Trust Co. Louis C. Kunz was in possession of 1,425 shares of the common stock and 600 shares of preferred

stock, but it was not new stock. It was part of the same stock delivered in escrow to the Guaranty Trust Co. by Burdick, Jansson, and Cohen. It is also true that after the transactions were completed Kunz delivered to the corporation for cancellation 600 shares of stock which he had received from Julian Burdick, and it was canceled as provided in the original agreement. But even if this reduction of the capital stock of the Marf Machine & Die Casting Co. was a part of the same transaction by which Julian Burdick parted with 600 shares of preferred stock and 441 shares of common stock, there was no reorganization or recapitalization within the meaning of section 202 (c) (2) in such transaction. When the 600 shares of preferred stock were delivered to the corporation by Louis C. Kunz to be canceled, the corporation gave no one anything in return. The stock was simply canceled, the capitalization of the corporation reduced, and the financial statement of the company improved. In order for this transaction to have come within the meaning of section 202 (c) (2), the 600 shares of preferred stock delivered to the corporation would have had to be delivered in exchange for something.

The very language of paragraph (c) of that section begins by saying: " For the purpose of this title, on an exchange of property, real, personal, or mixed, for any other such property, no gain or loss shall be recognized, etc." It will be seen from the foregoing language that there must be some kind of an exchange before a transaction comes under the purview of section 202 (c) (2).

Therefore we hold that the mere surrender to a corporation of certain shares of preferred stock to be canceled, with nothing to be received from the corporation in exchange therefor, is not a reorganization within the meaning of section 202 (c) (2).

Of course, in making this statement we do not mean to hold that a recapitalization under a proper state of circumstances may not be a reorganization. For example, if corporation A has an outstanding capital stock of $100,000 represented by 1,000 shares of common stock of $100 par value per share, and decides to reduce its capital stock to $50,000, to be represented by 500 shares of common stock of a par value of $100 each, and provides that each stockholder shall receive in exchange one share for each two shares now held, we think that would undoubtedly be a reorganization because there would be the exchange contemplated by section 202 (c) (2) and in such transaction no gain or loss would be recognized.

But if corporation A has an outstanding capital stock of $100,000, consisting of $50,000 common and $50,000 preferred, and decides to reduce its capital stock to $50,000 common by cancellation of all its preferred stock, but gives its stockholders nothing in exchange, and they agree to it, such transaction, we think, would not be a reorgani-

zation within the meaning of section 202(c)(2). True, if this preferred stock is all owned by the stockholders in the same proportion to their holdings of common stock, there would be no actual loss to any stockholder, because the benefits resulting from the cancellation of the preferred stock would be equally distributed. *Edith Scoville*, 18 B. T. A. 261.

The failure to allow a taxpayer a deductible loss under such circumstances does not result however from any provision of section 202(c)(2), but because of the fact that no actual loss has been sustained. In view of what we have said above, we hold that the transactions in this proceeding are those in which gain or loss may be recognized. Therefore the question to be decided is: What loss did Julian Burdick suffer in the transactions?

It seems to us that the facts in this case, in so far as the transfer of the shares of common stock is concerned, are very similar to those in *George M. Wright*, 18 B. T. A. 471. In that case a taxpayer had purchased stock in 1902. In 1922 the company was in financial difficulties and the bankers who had made loans to the company advised it that no further funds would be forthcoming unless the stockholders would surrender 51 per cent of their stock to the bankers. This was done and said stock which was surrendered was given to a new manager appointed by the bankers. The Board in that case held that the taxpayer sustained a loss of the cost to him of the shares of stock which he surrendered.

As has been stated, Julian Burdick was the owner of all the preferred stock of the corporation and if he had been the owner of all the common stock, there would have been no loss to him in his surrendering for cancellation the 600 shares of preferred stock owned by him. *Edith Scoville, supra.* In that case we said: " The remaining stock absorbed the value inherent in the surrendered certificates and there was no more loss than there is a gain in a stock dividend. *Eisner* v. *Macomber*, 252 U. S. 189; *Towne* v. *McElligott*, 274 Fed. 960."

But Julian Burdick was not the owner of all the common stock of the corporation. On the contrary, when the transaction was completed, evidenced by the agreement carried out by the Guaranty Trust Co., he was the owner of only 159 shares of the common stock of the corporation—the balance was owned by other stockholders. Therefore when the 600 shares of preferred stock were turned in to the corporation for cancellation some time in April, 1923, the exact date not shown, but after the common stock had been redistributed, the common stock which Burdick owned did not receive all the benefit of the cancellation. It received only its proportional share of the benefit. Since there were 1,900 shares of the common stock outstanding, the loss of Julian Burdick in the can-

cellation of his 600 shares of preferred stock was the cost thereof, $60,000, diminished by 159/1900 of $60,000. Therefore, we think the deductible loss which should be allowed to petitioner on the whole transaction is $73,355.01 instead of $78,376.06 as claimed on the original return. Such result is arrived at as follows:

Loss of petitioner:

| | | |
|---|---|---|
| Cost, 600 shares preferred stock, $100 per share | | $60,000.00 |
| Cost, 600 shares common stock, $41.66 per share | | 25,000.00 |
| Total cost | | 85,000.00 |
| Number of shares retained: | | |
| 159 shares common stock, $41.66 per share | $6,623.94 | |
| Proportional benefit to 159 shares common stock retained by petitioner resulting from cancellation of 600 shares preferred stock— | | |
| $\frac{159}{1900} \times \$60,000$ | 5,021.05 | |
| | | 11,644.99 |
| | | 73,355.01 |

Reviewed by the Board.

*Decision will be entered under Rule 50.*