STEPHEN M. CLEMENT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WILLIAM S. ROGERS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ELLA C. GOODYEAR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WILLIAM A. ROGERS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

NORMAN P. CLEMENT, AS TRUSTEE OF THE ESTATE OF STEPHEN M. CLEMENT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 50805, 50861–50864.   Promulgated May 17, 1934.

*Ralph M. Andrews, Esq.,* for the petitioners.
*George D. Brabson, Esq.,* for the respondent.

OPINION.

MURDOCK: The Commissioner determined deficiencies for the year 1926 as follows:

| Petitioner | Docket No. | Deficiency |
|---|---|---|
| Stephen M. Clement | 50805 | $1,267.00 |
| William S. Rogers | 50861 | 68.76 |
| Ella C. Goodyear | 50862 | 32,996.70 |
| William A. Rogers | 50863 | 15,501.27 |
| Norman P. Clement, trustee, estate of Stephen M. Clement | 50864 | 12,228.03 |

The sole issue in each case is, Did the petitioner sustain a loss in 1926 from the disposition of common and preferred stock of Rogers-Brown Iron Co., and, if so, in what amount? The facts in all five cases are substantially identical except for the number of shares involved and the amounts of the checks which passed as part of the transaction. The facts have been stipulated. A brief statement of the facts relating to the case of Ella C. Goodyear will suffice for our purposes.

In the latter part of 1925, Ella C. Goodyear was the owner of 5,000 shares of the common stock and 1,600 shares of the preferred stock of Rogers-Brown Iron Co. Her basis for gain or loss on each of these shares was $100.

Rogers-Brown Iron Co. was a corporation engaged in the manufacture of pig iron. Its operations had been successful prior to 1920, but it began to lose money in 1920 and 1921 due to a severe depression in the industry, increased taxes, increased freight rates, and sharp competition. It owned a large and valuable ore property in Minnesota known as the Susquehanna Mine, which it could not operate profitably because of the reduction in the amount of pig iron which it could market. Its earnings declined and its surplus disappeared. At the beginning of 1925 it had a deficit. It did not have sufficient funds with which to meet the next payment of interest on its outstanding indebtedness. M. A. Hanna Co., another iron manufacturer, in August 1925 offered to provide the needed financial assistance. M. A. Hanna Co. wanted to obtain an interest in the Susquehanna Mine, control, jointly with other allied interests, of Rogers-Brown Iron Co., through ownership of 80 percent of its stock, a contract with Rogers-Brown Iron Co. permitting M. A. Hanna Co. to manage Rogers-Brown Iron Co.'s Iron River mines on a commission basis, and a contract with Rogers-Brown Iron Co. for the exclusive sale of its output of pig iron. In consideration of these things M. A. Hanna Co. was willing to take such steps and to provide such additional working capital as might be necessary to relieve the Rogers-Brown Iron Co. from its current difficulties, including (1) refunding of its indebtedness over a substantial period of time; (2) additional working capital; (3) relief from operating the Susquehanna Mine on an unprofitable basis.

An agreement was executed on September 24, 1925. The parties to it included Rogers-Brown Iron Co., certain stockholders of that company, including the petitioner, M. A. Hanna Co., Central Trust Co., Central Securities Co., and a group of banks to which Rogers-Brown Iron Co. was indebted. Central Securities Co. was interested in the plan in order to protect the bondholders of Rogers-Brown Iron Co.. for which its affiliate, Central Trust Co., was

trustee, and also in underwriting such new securities as might be marketed as a part of the refinancing plan. Central Securities Co. agreed to sell gold notes of Rogers-Brown Iron Co. of the par value of $1,000,000. Rogers-Brown Iron Co. by this plan obtained relief from certain onerous requirements of a mortgage, additional time in which to pay its indebtedness to the banks, and additional working capital, and conveyed the Susquehanna Mine to a new corporation which assumed indebtednesses amounting to about $4,000,000. The following paragraphs are quoted from the agreement:

4. The Rogers Company will issue and sell to the Rogers Stockholders (in proportion to their aggregate holdings of stock—both common and preferred included) and the Rogers Stockholders severally agree to purchase from the Rogers Company (in such respective proportions), One Million Dollars ($1,000-000.00) in principal amount of the gold notes maturing January 1, 1931, at par and accrued interest.

5. The Rogers Stockholders, severally owning or controlling the number of shares of preferred and common stock of the Rogers Company set opposite their respective names, collectively amounting to more than eighty per cent. (80%) of the outstanding common and preferred stock of the Rogers Company, severally agree to sell to the Securities Company, and the Securities Company agrees to purchase from the Rogers Stockholders, said $1,000,000.00 of gold notes and (in proportion to their aggregate holdings of stock) $2,040,-000 par value of the present outstanding preferred stock and $4,000,000 par value of the present outstanding common stock of the Rogers Company at and for the price of $1,000,604.00 plus any accrued and unpaid interest on such notes.

Each of the Rogers Stockholders, within five (5) days after the execution of this Agreement by him, shall deposit with The Marine Trust Company of Buffalo certificates duly endorsed in blank for the number of shares of preferred and common stock of the Rogers Company agreed by him to be sold to the Securities Company, as provided in this paragraph 5, in escrow, to be delivered by said Trust Company to the Securities Company upon the consummation of this contract and to be returned to said respective stockholders if, without default on the part of the Rogers Stockholders or the Rogers Company, the transactions provided for in this Agreement shall not be consummated on or before February 1, 1926.

\* \* \* \* \* \* \*

8. The transactions hereinbefore provided for shall be consummated substantially simultaneously on or before February 1, 1926; but irrespective of the date when so consummated the transactions shall be deemed to be closed and all adjustments made as of January 1, 1926.

On October 15, 1925, representatives of the Rogers-Brown Iron Co. stockholders orally agreed with Central Securities Co. that, instead of each stockholder depositing his stock within five days after the execution of the written agreement, each should deposit 80 percent of his total stockholdings with the escrow agent on or before the close of business on December 30, 1925, and Central Securities Co. should deposit its check, payable to the respective depositing stockholders, with the escrow agent on or before December 30, 1925. They further

agreed that each stockholder should elect, not later than the time at which he deposited his stock, how much of that stock should be delivered to Central Securities on December 30, 1925, and how much should be delivered on January 2, 1926, and Central Securities should then issue its checks dated 1925 or 1926 as the stockholder had elected.

Ella C. Goodyear, in accordance with this agreement, elected to have one half of the common and preferred stock which she deposited delivered to Central Securities Co. on December 30, 1925, and to have the other half delivered to Central Securities Co. on January 2, 1926, and to have two checks delivered to the escrow agent in the appropriate amounts, one dated December 30, 1925, and the other dated January 2, 1926. On December 28, 1925, Ella C. Goodyear deposited with the escrow agent certificates duly endorsed in blank for 4,000 shares of common stock and for 1,280 shares of preferred stock of Rogers-Brown Iron Co., being 80 percent of her total holdings of each of these stocks, and her two checks each in the amount of $43,708.61, one dated December 30, 1925, and the other dated January 2, 1926, in accordance with paragraph 4 of the agreement quoted above. At the same time she instructed the escrow agent that 2,000 shares of the common stock and 640 shares of the preferred stock should be delivered to Central Securities Co. or its nominees on December 30, 1925, provided that a check of Central Securities Co. payable to the petitioner in the sum of $43,735.01 was received on that date and, further, that 2,000 shares of common stock and 640 shares of preferred stock were to be delivered to Central Securities Co. or its nominees on January 2, 1926, provided that a check of Central Securities Co. payable to her in the sum of $43,735.01 was received on that date. On December 30, 1925, Central Securities Co. delivered to the escrow agent its two checks payable to Ella C. Goodyear, each in the amount of $43,735.01, one dated December 30, 1925, and the other dated January 2, 1926, with instructions to deliver these checks and others to the payees provided the latter deposited 80 percent of their holdings of Rogers-Brown Iron Co. preferred stock with the agent. Ella C. Goodyear received the two checks from the escrow agent on January 2, 1926, and on the same day deposited them in her bank account. On January 23, 1926, the escrow agent delivered to nominees of Central Securities Co. certificates for the Rogers-Brown Iron Co. common and preferred stock deposited with it, including the petitioner's 4,000 shares of common and 1,280 shares of preferred. Ella C. Goodyear kept her accounts and reported her income on the basis of cash received and disbursed. On her income tax return for the calendar year 1926, she claimed a deduction of $263,973.60 representing an alleged loss by her from the disposition

of 2,000 shares of common and 640 shares of preferred stock of Rogers-Brown Iron Co. deposited by her with the escrow agent for delivery on January 2, 1926. The Commissioner disallowed this claimed deduction.

The Revenue Act of 1926 provides that the loss from the sale or other disposition of property shall be the excess of the basis over the amount realized, and the amount realized shall be the sum of any money received plus the fair market value of the property (other than money) received. The petitioners disposed of a part of their stock. The bases have been stipulated. If the amount realized by each can be determined from the evidence, the loss of each can be computed. The petitioners contend that the amount realized by each was one cent a share. They rely upon the decision of the Board in *Ganson Depew*, 27 B.T.A. 515. Ganson Depew, the petitioner in that case was, like these petitioners, a stockholder of Rogers-Brown Iron Co. The only difference between the facts in that case and those in the present case, aside from differences of amount, is that Depew elected to have all of his stock delivered in 1926 instead of having part of it delivered in 1925 and part in 1926. This difference seems immaterial. The Board held in that case that Depew sold a part of his stock, the sale was consummated in the year 1926, the petitioner suffered a loss of the difference between $100 per share, his basis, and one cent per share, and was entitled to a deduction for 1926 equal to the amount of that loss. On further consideration of the evidence, the Board is of the opinion that it erred in the *Depew* case in holding the evidence sufficient to establish the amount of the loss sustained.

The agreement of September 24, 1925, provided that each stockholder of Rogers-Brown Iron Co. should issue his check to Rogers-Brown Iron Co. in an amount equal to a proportional part of $1,000,000 par value of the notes of that company, and the bankers should issue their checks to each stockholder in an amount which would exceed the amount of the check issued by the stockholder to the Rogers-Brown Iron Co. by one cent for each share transferred by the stockholder to the bankers. The checks were issued and the stock and notes were transferred to the bankers in accordance with the agreement. The petitioners contend that each sold a number of shares of stock to the bankers for one cent a share. The shares were disposed of but the evidence does not show that they were sold for one cent each. It is true that, in computing the amount of the check to be issued by the bankers, one cent was added for each share transferred by that particular stockholder. But the bankers received notes and stock for which they paid a lump sum, and we cannot conclude from the evidence presented, either that

they paid par for the notes or that they paid only one cent a share for the stock. Where two kinds of property are transferred, a lump sum is received in payment, and it is necessary to determine how much of the payment was for each class of property, consideration must be given to the relative values of the different classes of property. The use of one cent a share in the computation does not show conclusively that but one cent was paid for each share of stock. The fact of the matter probably is that the notes were worth less than par and the stock was worth more than one cent a share. The record does not show how much the bankers received for the notes nor what they did with all of the shares which they received. The apparent effect of what was done was that each stockholder made a capital contribution to his corporation by going through the form of purchasing notes at par which he well knew were not worth par, and then selling those notes and a part of his stock for a net amount equivalent to the par value of the notes plus one cent for each share of stock transferred. The net amount received may have been the equivalent of the fair market value of the notes and stock or it may have been more or less than that amount. The obvious purpose of these petitioners in entering into this agreement was to relieve their corporation of some of its financial burdens and to obtain additional working capital for it so that added value would be given to the shares which each retained. This purpose was accomplished and the stock which each retained may have been enhanced in value. In order to establish a loss under the statute, it is necessary for the petitioners to show the fair market value of the property (other than money) received. The value of the consideration received by each of these petitioners is not shown by the evidence and, consequently, the Board is unable to compute the gain or loss from the disposition of the shares.

The Circuit Court of Appeals for the Seventh Circuit held in a similar situation that " the fair market value of the stock at the time of surrender may properly be regarded as the price realized for it by the taxpayer in the form of contemplated advantage ", and the deductible loss would be the difference between this value and the basis. *Commissioner* v. *Wright*, 47 Fed. (2d) 871, reversing 18 B.T.A. 471. However, the value of the stock at the time surrendered is not shown by the evidence in this case. The book value of the outstanding common and preferred stock as of January 1, 1925, and as of January 1, 1926, after the various adjustments under the agreement of September 24, 1925, were made on the books, is shown. There were 25,500 shares of preferred and 50,000 shares of common outstanding on each of those dates. The book value of

80 percent of the stock was $5,507,546.40 on January 1, 1925, and $3,078,274.73 on January 1, 1926. This is the stock which the petitioners contend was sold for a total consideration of $640.

In the case of *Helene Baldwin Burdick, Executrix*, 20 B.T.A. 742, Burdick, a stockholder and creditor of a corporation, owning all of the preferred shares and one half of the common shares of the stock of the corporation, which was in financial difficulties, entered into an agreement with two other stockholders and an outside party in order to induce the outsider to contribute $40,000 to the corporation and become its manager. The $40,000 was used to pay off some indebtedness of the corporation, Burdick's preferred shares were canceled, and a part of his common shares were transferred to the new manager. The Board, purporting to follow its decisions in *Edith Scoville*, 18 B.T.A. 261, and the *Wright* case, *supra*, which had not yet been reversed, held that the stockholder was entitled to deduct as a loss the cost of the common and preferred stock which he surrendered, less the proportionate benefit to his retained common stock which resulted from the cancellation and retirement of the preferred stock. Thus the Board recognized that in computing Burdick's loss reduction would have to be made for the benefits which he received under the plan and which came to him indirectly through the probable increase in value of his retained stock. These benefits might have been greater or less than the Board thought. The case was affirmed on appeal, *Commissioner* v. *Burdick*, 59 Fed. (2d) 395. In the present case the preferred stock surrendered by these petitioners was not canceled, but apparently was held by other stockholders. However, as we have said before, these petitioners, in disposing of their stock, were bargaining for and obtained some valuable consideration, the precise value of which is not shown. They had the burden of showing the amount of their loss, and we are unable to determine that amount from the evidence.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

SMITH and LEECH dissent.