J. K. Downer and Edith Downer, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket No. 2082–65. Filed April 27, 1967.

*Jerry D. Luptak* and *Basil M. Briggs,* for the petitioners.
*Charles R. Abbott,* for the respondent.

Tannenwald, *Judge:* Respondent determined a deficiency in petitioners' income tax for the taxable year 1961 in the amount of $36,-365.31. Petitioners have claimed an overpayment of income taxes for 1961 in an unspecified amount. After concession by petitioners of certain issues, there remains for us to decide whether petitioners are entitled to a deduction in 1961 in respect of stock transferred in that year and, if so, the nature and amount of such deduction.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners are husband and wife and resided in Saginaw, Mich., at the time of the filing of the petition herein. They filed their joint Federal income tax return for 1961 with the district director of internal revenue at Detroit, Mich. Any reference to "petitioner" shall be to J. K. Downer, his wife, Edith, being a party to this proceeding merely by having joined in the 1961 return.

During the period involved in this proceeding, the Downer Aircraft Co. (hereinafter referred to as the corporation) was engaged in the manufacture and sale, through dealers, of a four-place, low-wing, single-engine airplane for civilian use known as the *Bellanca.* It was still engaged in the same type of business at the time of trial. In 1960 and 1961, the corporation had severe working capital problems and required additional substantial capital to continue in business.

The corporation decided to make a public offering of the corporation's stock through underwriters to residents of the State of Minnesota. The underwriters agreed to underwrite the sale of 425,000 shares at $1.15 per share, of which 15 cents was brokerage commission. The underwriters later changed their minds and, on December 15, 1960, simply agreed with the corporation to use their "best efforts" to sell the 425,000 shares.

The underwriters filed an application for registration with the Minnesota Securites Commission in November 1960, which registration was finally approved in March 1961. Immediately prior to the

order approving the registration, the underwriters canceled the December 15, 1960, agreement with the corporation. Because the corporation could find no other underwriters to handle the public offering, it decided to sell its own stock directly to the public and obtained a new order from the Minnesota Securities Commission authorizing such procedure. The corporation hired Irving L. Turner, an experienced broker in over-the-counter sales, to help sell its stock to the public. Turner attempted by various means to sell the stock, including contacting other brokers, personal telephone calls to prospective customers, advertisements in the local newspapers, and exhibiting the *Bellanca* airplane on the plaza of the First National Bank of Minneapolis and on the steps of the State Capitol Building in Minneapolis, taking orders from people on the street. Despite Turner's efforts, the public offering was a failure as far as the corporation was concerned.

In February 1961, prior to the public offering, the corporation hired Carl B. Wootten as vice president and sales manager. Wootten was an experienced airplane executive who had spent his entire working life in the aircraft industry and had skills and industry contacts sorely needed by the corporation. Petitioner induced Wootten to join the corporation on the basis that the proposed public offering would generate sufficient funds to provide adequate working capital, permit establishment of a nationwide sales organization, and support airplane production sufficient to generate substantial profits. Prior to Wootten's being hired by the corporation, his salary, benefits, and conditions of employment were discussed and agreed upon with petitioner but the arrangement was never reduced to writing. Petitioner was content to rely on Wootten's integrity in the performance of his duties.

The failure of the public offering made it impossible for Wootten to establish a sales organization. Instead, Wootten was forced to devote his time and talents to the unsuccessful solicitation of money for working capital.

During 1961, Wootten had other opportunities for employment, of which petitioner was aware, but Wootten was unwilling to leave the employ of the corporation because he "just couldn't leave Mr. Downer in a lurch."

In the spring of 1961, Wootten recommended to petitioner a possible merger with Hammond Aircraft Co., a small west coast airplane manufacturing company owned by one Tirey Ford. Wootten had met Ford in 1940 and had been associated with him in the aircraft industry during the years 1940 through 1946, developing a business relationship and close friendship with him.

In July 1961, petitioner was keenly interested in accomplishing a merger with Hammond, believing it would be beneficial to the corporation. In July 1961, petitioner took Wootten with him to San Francisco to discuss the merger with Ford.

During the merger negotiations, petitioner decided to transfer 100,000 shares of his corporation stock to Wootten with the hope and expectation that: (1) Wootten would be induced to remain with the corporation regardless of the outcome of the negotiations and (2) Wootten would use his influence with Ford to help accomplish the desired merger. On July 6, 1961, petitioner wrote Wootten that he would assign 100,000 shares of stock in the corporation to him. Prior to that time Wootten had no idea that petitioner intended to transfer any of the corporation's stock to him. Petitioner's motive for the transfer of the 100,000 shares of stock was never communicated to Wootten. Petitioner and Wootten had never discussed Wootten's having a proprietary interest in the corporation. At no time did petitioner ask for or receive from Wootten, nor did Wootten offer to give to petitioner, any commitment in return for the stock transfer. However, Wootten either knew or reasonably should have known the considerations which motivated petitioner to transfer the shares.

At the time petitioner wrote Wootten, his shares of the corporation were in escrow with the Fidelity Bank & Trust Co. of Minneapolis, as required by the Minnesota Securities Commission. The commission on November 7, 1961, authorized the transfer of the 100,000 shares to Wootten on the condition that Wootten leave the shares in escrow under the same terms and conditions as were applicable to petitioner. The 100,000 shares were transferred to Wootten in 1961 sometime after November 7.

Both at the time he wrote Wootten and immediately prior to the approval of the Minnesota Securities Commission, petitioner owned 425,000 shares of the corporation, constituting in excess of two-thirds of the then issued and outstanding shares. The 100,000 shares of stock had an adjusted basis for Federal income tax purposes of at least $100,000.

The merger negotiations were discontinued when petitioner discovered Hammond was not in a better financial position than the corporation.

Wootten remained as superintendent and executive officer of the corporation until December 1962, terminating his employment because the corporation could no longer pay his salary.

During the period May through December 1961, there were numerous cash sales of the corporation's stock at $1.15 per share in lots ranging from 10 shares to 3,000 shares, with the average sale covering 200 to 250 shares. A total of 106,853 shares were thus sold. During 1962, cash sales were made of 72,502 shares at $1.15 per share in similar-sized lots, although one lot consisted of 10,000 shares. A few sales in small lots were made in March 1963, also at $1.15 per share. The purchasers were primarily unsophisticated investors who were willing to spend

relatively small sums to speculate on a cheap unlisted stock without regard to the underlying financial structure.

During the period May through December 1961, 58,211 shares were exchanged for debts of the corporation at $1.15 per share and during 1962, 6,342 shares were similarly exchanged at the same price.

The book value of the stock, taking into account a revaluation surplus, was $1.7150 per share as of September 30, 1960, and $0.9348 per share as of September 30, 1961. The revaluation surplus was supported by an independent appraisal. Eliminating the revaluation surplus, there was a deficit of $107,108 in stockholders' equity or a book value of minus $0.90 as of September 30, 1960. By September 30, 1961, this deficit had been eliminated and the book value per share was plus $0.37724.

For the fiscal years ended September 30, 1960, 1961, and 1962, the corporation's gross receipts from sales were $1,078,381, $256,390, and $71,531, respectively. The corporation never operated at a profit. Its Federal income tax returns showed net operating losses of $130,929, $65,231.75, and $80,372.44, respectively.

During the summer of 1961, petitioner made two offers to sell the remaining 325,000 shares to prospective investors for $50,000, which offers were rejected. After Wootten left the employ of the corporation, petitioner in 1963 sold 28,000 shares and in 1964 sold 52,000 shares, at $0.05 per share.

The fair market value of the 100,000 shares transferred by petitioner to Wootten was $15,000.

On his 1961 return, petitioner claimed an ordinary deduction of $90,000 for his loss on the 100,000 shares, representing the difference between his adjusted basis of $100,000 and the alleged increase of $10,000 in the value of his remaining shares. In his petition he claimed the full $100,000.

OPINION

In essence we are faced with three issues herein: (1) Did petitioner suffer any loss at all from the transfer of 100,000 shares of stock to Wootten; (2) if petitioner suffered a loss, was it capital or ordinary in nature; and (3) what is the proper measure of the loss. Petitioner contends that he indeed did suffer a loss, that the transfer did not involve a "sale or exchange" with the result that the loss was ordinary in nature and fully deductible under section 165(c)(2)[1] because it was incurred in a "transaction entered into for profit," and that the measure of his loss is the cost basis of the shares, or alternatively, the cost basis less what he conceives to be the value of the shares at the time of transfer. Respondent urges that a "sale or exchange" was involved and

---

[1] All references are to the Internal Revenue Code of 1954.

that consequently, if the petitioner suffered a loss, it was capital in nature and deductible only within the limits set by sections 165(f), 1211, and 1222. Respondent goes on to argue, however, that the value of the shares at the time of transfer was at least equal to petitioner's cost basis and that consequently petitioner suffered no loss from the transaction with Wootten. The parties are in agreement that if the transfer is held to be a sale or exchange, any loss is long term.

Each of the parties has carefully traced the evolution of the cases dealing with the problems involved herein and cases encompassing tangential questions. Each, quite understandably, finds clear support for his position and exhibits little or no concern for the seeming murkiness of some of the decisions in regard to the underlying facts involved and the applicable statutory provision, or the impreciseness of language in the opinions.[2]

If a cash payment had been involved herein, there is no question that petitioner would have been held to have made a capital contribution to the corporation and he would not have been entitled to any loss. The cases deny a deduction under such circumstances whether or not the payment flowed directly to the corporation or to a third party for the benefit of the corporation and whether each stockholder participated proportionately or disproportionately in the payment. *Wohl* v. *United States*, 267 F. 2d 605 (C.A. 5, 1959); *H. William Ihrig*, 26 T.C. 73 (1956); *Irving S. Sokol*, 25 T.C. 1134 (1956); *Harry Sackstein*, 14 T.C. 566 (1950); *Eskimo Pie Corporation*, 4 T.C. 669 (1945), affirmed per curiam 153 F. 2d 301 (C.A. 3, 1946); *Michigan Central Railroad Co.*, 28 B.T.A. 437 (1933) (issue I); reversed on other issues sub nom. *New York Cent. R. Co.* v. *Commissioner*, 79 F. 2d 247 (C.A. 2, 1935); *W. F. Bavinger*, 22 B.T.A. 1239 (1931); *Charles M. Howell*, 22 B.T.A. 140 (1931), appeal dismissed 69 F. 2d 447 (C.A. 8, 1934).

One might well question why there should be a different result simply because the subject matter of the transaction was stock of the corporation. As Judge Murdock long ago pointed out while dissenting in *George M. Wright*, 18 B.T.A. 471, 473 (1929), modified 47 F. 2d 871 (C.A. 7, 1931):

Whether he contributes cash or gives up part of his stock as here, his reason for so doing is to protect and make more valuable the stock which he continues to own. A relationship between the stock he gives up and that he continues to hold is thus established and he can have no loss on the one, when contributed, but must wait until he finally disposes of the other, for at that later time it may develop that he has a gain on the whole transaction. * * *

Certainly a unitary view of a shareholder's total investment in a corporation would confirm such an approach. There is no necessary

---

[2] For an analysis of decisions in the area of the problems involved herein, see O'Brien, "Stock Transfers by Shareholders to Outsiders for Nontangible Consideration," 39 Taxes 675 (1961).

lack of logic in the proposition that a shareholder realizes no gain or loss until he has disposed of his entire stock investment. Clearly, however, the evolution of the statutory and decisional framework has been on a fragmented, i.e., share by share, rather than a unitary view of a shareholder's investment. Thus, for example, a shareholder who sells a portion of his shares realizes taxable gain or loss measured by the difference between amount received and his cost basis in those shares even though dollarwise the transaction does not recoup his total investment.

Once the fragmented view is accepted—as we think it must be—it is possible to draw a distinction between the situation where a shareholder transfers cash and where he transfers part of his shares to a third party.[3] In the former case, there is no change in his proportionate shareholder interest in the corporation—only his investment has been varied.[4] In the latter case, such a change admittedly takes place.

While the foregoing exposition unfortunately is not mirrored by the opinions in the decided cases, the authorities consistently support the proposition that, aside from the question of nature and extent of the loss, the type of transaction such as is involved herein can give rise to a deductible loss. *Commissioner* v. *Wright*, 47 F. 2d 871 (C.A. 7, 1931), modifying 18 B.T.A. 471 (1929) ; *Peabody Coal Co.* v. *United States*, 8 F. Supp. 845 (Ct. Cl. 1934) ; *Leo Sack*, 33 T.C. 805 (1960) ; *Stephen M. Clement*, 30 B.T.A. 757 (1934) ; *City Builders Finance Co.*, 21 B.T.A. 800 (1930) ; *Helene Baldwin Burdick, Executrix*, 20 B.T.A. 742 (1930), affirmed on other grounds 59 F. 2d 395 (C.A. 3, 1932). Even though *Leo Sack* was ultimately decided on the issue of proof as to the measure of the loss, it represents a recent reaffirmation by this Court of the earlier holdings in this area. In addition, a loss has been allowed where stockholders have surrendered shares disproportionately to the issuing corporation rather than to a third party. *Northwest Motor Service Co.* v. *United States* (D.N.Dak. 1960, 5 A.F.T.R. 2d 1557, 60–2 U.S.T.C. par. 9488) ; *Budd International Corporation*, 45 B.T.A. 737 (1941) ; *Julius C. Miller*, 45 B.T.A. 292 (1941) ; cf. *Estate of William H. Foster*, 9 T.C. 930 (1947).[5] The fact is that respondent has not seriously suggested that the instant situation does not qualify as a

---

[3] There is a paucity of cases dealing with the tax consequences where noncash property is transferred. Cf. *United States* v. *General Shoe Corporation*, 282 F. 2d 9 (C.A. 6, 1960).

[4] Similarly, where there is a prorata surrender of stock to the issuing corporation, it has uniformly been held that, since there has been no change in ownership, the transfers are contributions to capital and no deduction for a loss is allowed. *Kistler* v. *Burnet*, 58 F. 2d 687 (C.A.D.C. 1932), affirming 21 B.T.A. 433 (1930) ; *Taylor* v. *MacLaughlin*, 30 F. Supp. 19 (E.D.Pa. 1939) ; *Bed Rock Petroleum Co.*, 29 B.T.A. 118 (1933) ; *Charles M. Haft*, 20 B.T.A. 431 (1930) ; *Edith Scoville*, 18 B.T.A. 261 (1929).

[5] We see no need to comment on the measure of loss adopted in such cases. Compare *Julius C. Miller*, and *Estate of William H. Foster*, which measure the loss by the difference between the adjusted basis of the shares given up and the enhancement in book value to the shares remaining in the hands of the taxpayer, with *Budd International Corporation*, which did not so reduce the adjusted basis. Cf. also *Helene Baldwin Burdick, Executrix*.

"transaction entered into for profit" under section 165(c)(2). *Scherman* v. *Helvering*, 74 F. 2d 742 (C.A. 2, 1935) ; *Kress* v. *Stanton*, 98 F. Supp. 470 (W.D.Pa. 1951), affirmed per curiam 196 F. 2d 499 (C.A. 3, 1952) ; *Berner* v. *United States*, 282 F. 2d 720 (Ct. Cl. 1960).

In the light of the foregoing and despite the appeal of Judge Murdock's dissent in *George M. Wright*, *supra*,[6] we are not disposed to chart a new course. We hold that in the type of transaction involved herein, a deductible loss is not necessarily precluded.[7]

We turn now to the issue as to whether such a loss is capital or ordinary in nature. The fact that there is a "transaction entered into for profit" under section 165(c)(2) does not preclude a finding that any loss sustained is a capital loss. Sec. 165(f). Petitioner insists that there can be no "sale or exchange" herein because Wootten gave nothing in return. He points out quite accurately that Wootten made no promise in exchange for transfer of the shares and argues that therefore there was no consideration flowing to petitioner or to the corporation.[8] He places principal reliance on *Peabody Coal Co.* v. *United States, supra, George M. Wright, supra*, and *Budd International Corporation, supra*. We think these cases are clearly distinguishable. *Peabody Coal Co.* and *George M. Wright* involved taxable years where the applicable statutory provisions permitted a full deduction whether the loss was ordinary or capital in nature. Consequently, in neither case was there any reason for the court to deal with the nature of the loss.[9] *Budd International* involved a surrender of stock to the issuing corporation.[10] Granted, as petitioner contends, that the economic consequences to the transferring shareholder in both *Budd* and this case may be essentially identical, it does not follow that the characterization of the transaction for tax purposes is the same. In *Budd*, the shares were "surrendered" and many decisions in the tax arena have turned on the form of the transaction adopted by the taxpayer.

Petitioner does not deny the fact that he transferred his shares to Wootten in the hope and expectation that the latter would help in the negotiations with Tirey Ford and would continue to work for the

---

[6] See also *City Builders Finance Co.*, 21 B.T.A. at 804, where Judge Murdock again unsuccessfully advanced the same point of view.

[7] We do not consider *Walton O. Hewett*, 47 T.C. 483 (1967), inconsistent with this conclusion since the sole issue before the Court in that case was the taxpayer's claim to a deductible *expense* under sec. 162 or 212. Cf. *Berner* v. *United States*.

[8] The fact that the corporation rather than petitioner realized the benefit is immaterial. See *Scherman* v. *Helvering*, 74 F. 2d at 743.

[9] The same is true of *Scherman* v. *Helvering, Stephen M. Clement, City Builders Finance Co., Helene Baldwin Burdick, Executrix*. In *Berner* v. *United States, Kress* v. *Stanton*, and *Leo Sack*, the applicable statutory provisions did encompass the distinction between a capital loss and an ordinary loss, but in each of these cases, the transaction unquestionably involved a "sale," i.e., the transferee of the shares paid money to the transferor and, in any event, the courts did not consider the question of how the loss should be characterized.

[10] Although the shares were subsequently transferred to a third party, there is no indication that such a transfer was contemplated at the time of surrender and the court obviously did not consider the corporation a mere conduit.

corporation. The shares were the not-so-hidden persuader to these ends. Moreover, we have found that Wootten either knew or reasonably should have known that petitioner was so motivated.[11] Admittedly, the benefits might not materialize and admittedly petitioner had no legal claim on Wootten, but such considerations have not prevented the finding of a "sale or exchange." *United States* v. *General Shoe Corporation*, 282 F. 2d 9 (C.A. 6, 1960). Nor is it without significance that Wootten did in fact render services for 18 months after the promise of transfer.

Petitioner seeks to avoid the impact of these obvious factors by characterizing the transfer to Wootten as "a spontaneous unilateral impulse" on his part, "immaculate" in genesis and execution, and manifesting "sophisticated executive rapport." [12] We are not impressed by such Madison Avenue lingo. We prefer to approach the instant situation against the background of our "experience with the mainsprings of human conduct." See *Commissioner* v. *Duberstein*, 363 U.S. 278 (1960). We agree with respondent that petitioner could and did confidently rely on Wootten's willingness to continue to work for the best interests of the corporation.

Petitioner's position is not improved by the fact that Wootten's hoped-for response is difficult to value. Petitioner must have concluded that the value of such response to him was at least equal to the value of the shares transferred. This is the rationale of the Court of Appeals in *Commissioner* v. *Wright*, *supra*, which we have since reaffirmed. *Leo Sack*, *supra*; *Stephen H. Clement*, *supra*. Moreover, it is a rationale which has been adopted by the Supreme Court. *United States* v. *Davis*, 370 U.S. 65 (1962). In *United States* v. *General Shoe Corporation*, *supra*, the Court of Appeals had before it the question whether a voluntary contribution of appreciated real estate by the taxpayer to an employee retirement trust gave rise to taxable capital gain. The taxpayer argued that it received no consideration capable of valuation and therefore no gain was realized. In holding against the taxpayer, the court stated (282 F. 2d at 12) :

Literally the taxpayer is correct in its contention that it did not receive a tangible benefit * * * however, we do not conceive that in this day and age we are restricted to tangibles in tax matters where there is actual recognizable benefit, albeit intangible, the taxation of which is implicit in the statutory scheme, and where such benefit is clearly capable of being evaluated on an objective basis. * * *

Consequently we conclude that petitioner sold or exchanged his 100,000 shares and that his loss, if any, was capital in nature. Cf.

[11] Under these circumstances, *James M. Hunley*, T.C. Memo 1966–66, so heavily relied upon by petitioner, offers him no succor.

[12] By the use of such phrases, petitioner comes perilously close to arguing that he made a gift of the shares to Wootten, in which event he would not be entitled to any loss whatsoever. *Walter S. Mack, Jr.*, 45 B.T.A. 602 (1941), aff'd. 129 F. 2d 598 (C.A. 2, 1942).

*Kenan* v. *Commissioner*, 114 F. 2d 217 (C.A. 2, 1940), affirming 40 B.T.A. 824 (1939).

We further conclude that the measure of such loss is the difference between petitioner's adjusted basis in the shares and their fair market value at the time of transfer to Wootten. *Commissioner* v. *Wright*, *supra*.[13] To the extent that *Peabody Coal Co.* v. *United States*, *supra*, *Berner* v. *United States*, *supra*, *Scherman* v. *Helvering*, *supra*, and *Kress* v. *Stanton*, *supra*, adopt a contrary approach, their efficacy has been washed away by the tides of more recent decisions. *United States* v. *Davis*, *supra*, and *United States* v. *General Shoe Corporation*, *supra*.

We are thus left with the final question—what was the fair market value of the 100,000 shares at the time of their transfer to Wootten? Respondent has determined that it was not less than $100,000. Petitioner, on the other hand, asserts that it was not more than $8,000. The evidence leaves much to be desired. There were sales at $1.15 per share and conversions of debts into shares at the same price throughout 1961. The sales were to unsophisticated investors who were willing to spend relatively small sums to speculate on a cheap unlisted stock without regard to the underlying financial structure. In all probability the creditors were simply making the best of a difficult situation. Moreover, the sales and conversions were of relatively small blocks, while in the instant situation a block of 100,000 shares is involved.

The book values per share as of September 30, 1961, were substantial. The same is true as of September 30, 1960, if the revaluation surplus is taken into account, although without that surplus the book value was a minus figure. The corporation was still in business at the time of trial herein.

While all of the foregoing elements have a bearing, they do not conclusively point to a fair market value of $100,000.

On the other hand, petitioner's evidence clearly falls short of sustaining a value of only $8,000. Turner testified in a general way that potential customers were only willing to pay 2 cents to 8 cents per share in the summer and fall of 1961. Petitioner testified that he made two unsuccessful attempts in the summer of 1961 to sell his remaining 325,000 shares for $50,000 but the reasons for the refusals to purchase are not clearly revealed, although it can fairly be inferred that at least one reason they were unwilling to pay such amount was that

---

[13] In *Helene Baldwin Burdick, Executrix*, the transaction was treated as a transfer to a third party but a different measure of loss was used, i.e., the difference between the adjusted cost basis of the transferred common shares and the increase in book value of the remaining shares. The fact is that, in that case, preferred shares were also surrendered to the corporation and it was the book value of these shares, which for aught that appears was the same as the fair market value, that was taken into account. See fn. 5, *supra*.

the corporation was financially sick. The sales by petitioner in 1963 and 1964 are of limited probative value as to the situation in 1961, particularly since they occurred after Wootten, who was a key figure, had left the employ of the corporation.

We are convinced that any purchaser of a substantial block of issued and outstanding shares would not have been willing to pay any large amount, in view of the obvious necessity of further investment of substantial funds in the corporation in order to put it on its feet. In addition, we cannot ignore the fact that, although constituting a large block, 100,000 shares represented a minority interest in the corporation. Taking these factors into account and doing the best we can with the totality of the evidence before us, we have found that the fair market value of 100,000 shares (both in July 1961 when petitioner announced his intention to Wootten and at the time of actual transfer in late 1961) was $15,000. Accordingly, petitioner is entitled to a long-term capital loss of $85,000.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

RAUM, *J.*, dissents.

---

DRENNEN, *J.*, dissenting. I disagree with the conclusion of the majority that petitioner sustained a loss, during the taxable year, incurred in a transaction entered into for profit. My reasons are basically the same as those which formed the basis for Judge Murdock's dissenting opinion in *George M. Wright*, 18 B.T.A. 471, 473. I realize that the conclusion reached by the majority on this point finds support in some of the older cases cited but, as noted in the majority opinion here, the opinions in those cases do not clearly demonstrate why the conclusions reached were correct. I respectfully suggest that the majority opinion here does not do so either, except in a somewhat negative fashion.

One example of the murkiness in decisions concerning the allowance of losses in transactions similar to this one is in pinpointing just when the "transaction entered into for profit" commenced. It would seem that it should be when petitioner originally bought the stock, with the profit motive being inferred from the mere nature of the asset purchased, because his expenditure at that time forms the basis for his loss. If such is the case we should look to the transaction here involved (the transfer of the stock to Wootten) only to determine whether there was a closed transaction with respect to the particular stock involved which gave rise to a realized loss at that time, and, if so, whether the loss was ordinary or capital in nature. If such is the proper approach, then under circumstances such as those involved here, as said by Judge Murdock, "A relationship between the stock

he gives up and that he continues to hold is thus established" and he can have no loss until he disposes of the stock he retained.

On the other hand, the cases seem to emphasize, possibly to avoid the implication that the transfer in a case like this was a gift, that the anticipated profit would arise from the increment in value of petitioner's retained stock expected to result from the services to be rendered by the recipient of petitioner's largess. This in turn suggests that the "transaction entered into for profit" was the transfer of the stock to Wootten in this case. If this is true I do not think the transaction is closed until it can be determined whether the anticipated benefits will be realized, i.e., upon the sale or other disposition of petitioner's remaining stock. Otherwise it would be difficult to characterize the transfer as a "transaction entered into for profit," because if we cut it off there the transferor knows that he will suffer a loss, rather than a profit, out of this particular transaction, the loss being of his investment or basis in the stock transferred which, according to the majority, was greater than the consideration received for the stock. If petitioner expected Wootten's services to increase the value of his remaining stock to the point where he could at least recover his entire investment in the corporation, then he realized no loss on the transfer. If he expected Wootten's services to have a lesser value, then he was not entering into this transaction for a profit, but rather to avoid or reduce his losses.

WITHEY, PIERCE, and FORRESTER, *JJ.*, agree with the dissent.