Leroy FRANTZ, Jr. and Sheila
Frantz, Petitioners,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent.

No. 154, Docket 85–4062.

United States Court of Appeals,
Second Circuit.

Argued Oct. 1, 1985.

Decided Feb. 19, 1986.

Patrick J. Carr, New York City (Eagle &
Fein, P.C., New York City of counsel), for
petitioners.

David Pincus, Appellate Section, Tax
Div., Dept. of Justice, Washington, D.C.
(Glenn Archer, Jr., Asst. Atty. Gen., Wash-
ington, D.C., Fred T. Goldberg, Jr., Chief

**120**

Counsel, Washington, D.C., of counsel, for respondent.

Before LUMBARD, MANSFIELD and WINTER, Circuit Judges.

MANSFIELD, Circuit Judge:

Leroy Frantz, Jr. and his wife Sheila Frantz (hereinafter referred to in the singular as the "taxpayer" since Mr. Frantz was the principal actor in the relevant transactions) appeal from a decision of the United States Tax Court, Sterrett, C.J., entered on January 29, 1985 (reported at 83 T.C. 162), holding that their non-pro-rata surrender of their preferred stock in a closely-held corporation controlled by them, Andree Biallot, Ltd. (ABL), and their cancellation of indebtedness for advances made to ABL for the purpose of enabling it to improve its financial statements and to attract outside financing, were capital contributions rather than ordinary losses deductible under § 165(c)(2) of the Internal Revenue Code of 1954 (hereinafter I.R.C.), 26 U.S.C. § 165(c)(2).[1] The taxpayer also appeals from the Tax Court's decision that the taxpayer's common stock in ABL did not qualify under I.R.C. § 1244, 26 U.S.C. § 1244,[2] for allowance of an ordinary loss of $50,000 on sale of a small business stock. We affirm.

The material facts are not disputed. On June 30, 1971, the board of directors and shareholders of ABL, a New York corporation that had been experiencing financial difficulties in the conduct of a perfume business, adopted a plan of reorganization whereby it would offer stock pursuant to § 1244. Prior thereto ABL had issued 1,677 shares of common stock for which it had received $219,250. During the period from September 25, 1970, to February 1,

1. Title 26 U.S.C. § 165 provides in pertinent part:

"SEC. 165. LOSSES.

(a) *General Rule.*—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

(b) *Amount of Deduction.*—For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

(c) *Limitation on Losses of Individuals.*—In the case of an individual, the deduction under subsection (a) shall be limited to—

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business;".

2. Title 26 U.S.C. § 1244 provided in pertinent part in the year 1973:

"§ 1244. LOSSES ON SMALL BUSINESS STOCK

(a) *General rule.*—In the case of an individual, a loss on section 1244 stock issued to such individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as a loss from the sale or exchange of an asset which is not a capital asset.

(b) *Maximum amount for any taxable year.* —For any taxable year the aggregate amount treated by the taxpayer by reason of this section as a loss from the sale or exchange of an asset which is not a capital asset shall not exceed—

\* \* \* \* \* \*

(2) $50,000, in the case of a husband and wife filing a joint return for such year under section 6013.

(c) *Section 1244 stock defined.*—

(1) *In general.*—For purposes of this section, the term 'section 1244 stock' means common stock in a domestic corporation, if—

(A) such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan,

(B) at the time such plan was adopted, such corporation was a small business corporation,

\* \* \* \* \* \*

(2) *Small business corporation defined.* —For purposes of this section, a corporation shall be treated as a small business corporation if at the time of the adoption of the plan—

(A) the sum of—

(i) The aggregate amount which may be offered under the plan, plus

(ii) The aggregate amount of money and other property (taken into account in an amount, as of the time received by the corporation, equal to the adjusted basis to the corporation of such property for determining gain, reduced by any liabilities to which the property was subject or which were assumed by the corporation at such time) received by the corporation after June 30, 1958, for stock, as a contribution to capital, and as paid-in surplus,

does not exceed $500,000; ..."

1971, the taxpayer had made advances of $80,000 to the corporation. Under the reorganization plan 41,925 shares of new preferred stock were issued by ABL in exchange for the company's outstanding 1,677 shares of the previously-issued common. As part of the plan a composition with creditors of ABL was negotiated whereby creditors classified as "Class C" creditors exchanged their claims against it totalling $383,840 for 76,768 shares of its new preferred. As one of these participating creditors, the taxpayer received 16,000 shares of new ABL preferred stock in exchange for claims of $80,000 for prior advances to ABL.

The June 30, 1971, reorganization plan authorized ABL to issue over a two-year period 500,000 shares of its common stock with a par value of $.01 per share on the understanding that the "maximum amount to be received by the Corporation in consideration of the stock to be issued pursuant to this plan or as a contribution to capital shall be $500,000." Upon adoption of the plan 276,250 new ABL common shares were issued to the taxpayer for $150,000, of which $2,762.50 represented payment for the stock at par value and $147,237.50 payment to capital surplus. At the same time 148,750 new common shares were issued at par value ($.01 per share) to the following:

Thomas M. Biallo, President ...85,000 shares
Patrick J. Carr, Executive Vice
    President .................42,500 shares
Francis X. Weston, Treasurer .21,250 shares

Thus the taxpayer was elected Chairman of the Board and became owner of 65% of ABL's outstanding common and 13% of its preferred.

During the period from June 1971 through July 1973 the taxpayer advanced approximately $208,600 to ABL, of which $50,000 represented senior indebtedness for which the taxpayer received a non-interest bearing note. The financial condition of the company, however, continued to deteriorate. As a result, on May 4, 1973, the taxpayer entered into a written agreement with ABL whereby he surrendered all of his ABL preferred stock and cancelled "all

notes and accounts receivable" due him, which he contributed "to the capital of the Company". In exchange, ABL agreed to accept the taxpayer's "contribution ... to its capital" in order to improve the company's financial statements and attract new capital from other sources. On November 9, 1973, the taxpayer entered into a similar agreement with ABL whereby he agreed to surrender "all notes and accounts receivable" due from ABL as a "contribution to ... capital". No similar surrender of shares or forgiveness of indebtedness was made by any other ABL stockholder. Thus the taxpayer's 65% ownership of ABL's outstanding common remained unaffected by the taxpayer's contributions to capital.

On December 27, 1973, the taxpayer sold his 276,250 shares of ABL common stock for $8,000, reflecting a loss of $142,000. For the year 1973 the taxpayer claimed ordinary losses of $210,600 for the surrender of the accounts and notes receivable to ABL, $32,000 for surrender of the preferred stock, and $50,000 under § 1244 on the sale of common stock. In addition, he claimed a long-term capital loss of $92,000 on the sale of the common stock. The Commissioner disallowed the claimed ordinary losses on the surrender of the notes, accounts receivable and preferred stock, on the ground that they represented contributions to capital. However, the taxpayer was allowed to increase the basis of the common stock by the amount of the surrendered preferred stock, notes and accounts receivable, thereby increasing the long-term deductible capital loss claimed on the sale of the common stock.

On November 26, 1979, the taxpayer filed a petition in the Tax Court for redetermination of the tax due, claiming that the surrenders to ABL of his preferred stock and earlier advances resulted in a loss "incurred in [a] transaction entered into for profit" within the meaning of I.R.C. § 165(c)(2). The Commissioner denied the material allegation that certain of the items were deductible as ordinary losses and further alleged that the taxpayer had improperly deducted $50,000 under § 1244 as an

ordinary loss on the December 1973 sale of the common stock, asserting that it must be treated as a long-term capital loss.

The taxpayer continued to claim that the surrender of the preferred stock and claims arising from $158,600 in advances were deductible as ordinary losses under a line of Tax Court cases holding that a shareholder's non-pro-rata surrender of stock to his corporation or to third parties in order to benefit the corporation results in an immediately deductible ordinary loss. *Smith v. Commissioner,* 66 T.C. 622 (1976), *rev'd sub nom., Schleppy v. Commissioner,* 601 F.2d 196 (5th Cir.1979); *Duell v. Commissioner,* 19 T.C.M. 1381 (1960); *Estate of Foster v. Commissioner,* 9 T.C. 930 (1947), *acq.* 1948–1 C.B. 2; *Miller v. Commissioner,* 45 B.T.A. 292 (1941), *acq.,* 1941–2 C.B. 9, *acq. revoked and nonacq. substituted,* 1977–2 C.B. 2; *Budd International Corp. v. Commissioner,* 45 B.T.A. 737 (1941), *acq.,* 1942–2 C.B. 3, *acq. revoked and nonacq. substituted,* 1977–2 C.B. 2, *rev'd on other grounds,* 143 F.2d 784 (3d Cir.1944), *cert. denied,* 323 U.S. 802, 65 S.Ct. 562, 89 L.Ed. 640 (1945); *Clement v. Commissioner,* 30 B.T.A. 757 (1934); *City Builders Finance Co. v. Commissioner,* 21 B.T.A. 800 (1930); *Burdick, Executrix v. Commissioner,* 20 B.T.A. 742 (1930), *aff'd,* 59 F.2d 395 (3d Cir.1932); *Wright v. Commissioner,* 18 B.T.A. 471 (1929), *modified,* 47 F.2d 871 (7th Cir.1931); *see also Scherman v. Commissioner,* 74 F.2d 742 (2d Cir.1935) (allowing immediate deduction for loss relating to transfer of shares to employee of the corporation); *Tilford v. Commissioner,* 75 T.C. 134 (1980), *rev'd,* 705 F.2d 828 (6th Cir.), *cert. denied,* 464 U.S. 992, 104 S.Ct. 485, 78 L.Ed.2d 681 (1983) (capital loss allowed on stock transfer to employee); *Downer v. Commissioner,* 48 T.C. 86 (1967) (capital loss allowed on stock transfer to employee).

The Tax Court ruled in favor of the Commissioner. Relying on recent decisions of the Fifth Circuit in *Schleppy v. Commissioner,* 601 F.2d 196 (5th Cir.1979), and the Sixth Circuit in *Tilford v. Commissioner,* 705 F.2d 828 (6th Cir.), *cert. denied,* 464 U.S. 992, 104 S.Ct. 485, 78 L.Ed.2d 681 (1983), it overruled the position taken by it for more than 50 years to the effect that each sale or surrender of stock must be treated as a discrete, fragmented, divisible transaction that closes with the sale or surrender itself. Instead it adopted the view that, when a stockholder surrenders his preferred stock on a non-pro-rata basis to a corporation for the purpose of improving the company's financial statement and enhancing the value of the stockholder's retained common, the transaction does not close until sale of the common. Under this analysis the taxpayer's surrender of the preferred stock in the present case did not result in a loss incurred in a "trade or business," I.R.C. § 165(c)(1), and was not a transaction entered into for profit within the meaning of I.R.C. § 165(c)(2), but was an "open" non-taxable transaction, the result of which, as far as gain or loss is concerned, could not be determined until the retained common stock was sold. 83 T.C. at 178–81. Accordingly the Tax Court ruled that the surrender constituted a capital contribution which would increase the basis of the taxpayer's common stock by the acquisition cost of the preferred and the amount of the surrendered notes and accounts receivable. In thus reversing its 50-year stand, the Tax Court noted that its prior position "tended to encourage a conversion of eventual capital losses into immediate ordinary losses" and amounted to a "judicial repeal of § 165(g), which treats a loss on worthless stock as a 'loss from the sale or exchange, on the last day of the taxable year, of a capital asset'" since it would be difficult to ascertain whether the surrendering taxpayer was motivated by a desire to strengthen the corporation or to convert a capital loss into an ordinary one. *Id.,* at 182.

The Tax Court further held that ABL did not qualify as a § 1244 "small business corporation" because the amount which it could receive for the common stock it issued pursuant to the plan, combined with the amounts received from its previous stock issues, totalled more than $500,000. *Id.,* at 182–86.

.Four members of the Tax Court dissented from its holding that the taxpayer's surrender of the preferred stock was a capital contribution and not deductible as an ordinary loss. They reasoned that each share of stock must be treated as a separate, fractional, divisible property unit representing rights that are lost when it is sold or surrendered and that it cannot be aggregated or unified with other retained holdings to create an "open," "unitary" transaction. *Id.*, at 188–89. Relying on this longstanding "fractional view", the dissenters believed that the stockholder's loss must therefore be recognized at the point of surrender. They would treat the loss as an ordinary one within the meaning of § 165(c)(2) because (1) the stock was originally acquired in a transaction entered into for profit, (2) the surrender did not constitute a gift because of its purpose (to enhance the value of the stockholder's retained shares), and (3) "not every disposition of a capital asset is a 'sale or exchange' so as to generate capital gain or loss." *Id.*, at 190–92.

## DISCUSSION

The principal issue before us is whether a controlling stockholder's non-pro-rata surrender of his preferred stock to his closely-held corporation for the purpose of enhancing the value of his retained common stock is a capital contribution or an ordinary loss deductible immediately under I.R.C. § 165(c)(2).[3] Resolution of the issue requires review of a few basic principles.

■■■ Before a loss resulting from a transaction may be deducted the transaction must be "closed" in the sense that it is complete and no further fluctuation in value of the asset claimed to be lost can occur. *See* 5 *J. Mertens, The Law of Federal Income Taxation* § 28.15 (1980). Losses on "open" transactions, or those in which the profit sought is only attainable in the future, are not deductible until the investment is terminated. *See* I.R.C. § 263(a);

*Commissioner v. Idaho Power Co.*, 418 U.S. 1, 16, 94 S.Ct. 2757, 2766, 41 L.Ed.2d 535 (1974). Payments made to further ongoing investments are not normally considered losses, but rather capital expenditures which are part of continuing investments. At the time when a transaction closes, losses sustained by the taxpayer may be deducted. *See* I.R.C. § 165(a) ("The.⸗e shall be allowed as a deduction any loss sustained during the taxable year ...."); Treas.Reg. § 1.165–1(d)(1), 26 C.F.R. 1.165–1(d)(1) (1985); *Dawn v. Commissioner*, 675 F.2d 1077 (9th Cir.1982) (losses "sustained" when transaction is "closed and completed"); *General Securities Co. v. Commissioner*, 123 F.2d 192, 194 (10th Cir.1941) ("no gain or loss would be realized until the stock was disposed of and a closed transaction effected").

■■ Normally one can ascertain with reasonable precision whether a transaction is closed or open since the taxpayer's motive and actions are unambiguous, e.g., when he makes a cash sale of stock owned by him. The issue becomes more complicated, however, when the stockholder surrenders stock to a corporation he controls in order to enhance the value of other stock of the company held by him. On the one hand, the stockholder immediately loses all of the rights associated with his ownership of the surrendered stock, including voting rights and the right to dividends, a share of the corporate assets, and any future increase in the proportionate value of each surrendered share. Under one view, sometimes referred to as the "fragmented" approach, the transaction is considered to be closed if the surrendered shares are worth less than the stockholder's acquisition cost. Adopting this approach, the taxpayer here contends that upon his surrender of his preferred stock to ABL he received nothing in return but lost his original investment. He therefore contends that his surrender of the preferred stock to the corporation

---

**3.** All parties agree that a pro-rata contribution of shares by stockholders to their corporation would not be an event for loss recognition. *See*

*Eisner v. Macomber*, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521 (1920); *Commissioner v. Hadley*, 75 F.2d 485 (2d Cir.1935).

should be treated as an event for loss recognition.

On the other hand, when the taxpayer's motive in surrendering his stock to the company is to benefit his remaining shares, as is the case here, the surrender in a sense represents a continuation of his original investment in the same company. *Cf.* I.R.C. § 263 (payments to increase the value of property). The surrendered shares have some value, although it may be less than the taxpayer's original cost. His surrender of the shares to the corporation, the Commissioner contends, should therefore increase the capital value of the shares retained by the taxpayer. Viewed in the light of the surrendering taxpayer's motive, it can reasonably be concluded that the original transaction remains open, at least to the extent that the surrendered stock still has value at the time it is contributed. Under this "unified" view the transaction would not close until the taxpayer disposed of his retained shares in the company. The surrender of the stock to the corporation would therefore not be considered an event for loss recognition. Instead, it would be treated in the same fashion as would the stockholder's payment of cash or transfer of property to his company to protect his interest therein, which constitutes a capital expenditure. I.R.C. § 263(a); *Commissioner v. Idaho Power Company, supra,* at 16, 94 S.Ct. at 2766 (1974) (property); *Perlman v. Commissioner,* 252 F.2d 890 (2d Cir.1958) (cash); *Eskimo Pie Corp. v. Commissioner,* 4 T.C. 669, 676 (1945), *aff'd per curiam,* 153 F.2d 301 (3d Cir.1946) (cash); *see also* Treas. Regs. §§ 1.61–12(a) (shareholder cancellation of indebtedness by the corporation), 1.263(a)–2(f) (payments by bondholders or shareholders to corporation pursuant to agreement).

Each of the two approaches advocated by the respective parties, the "unitary" by the Commissioner and the "fragmented" by the taxpayer, raise practical and jurisprudential problems. The "unitary" treatment of the transaction might, by postponing the date for recognition of a taxpayer's loss until an indefinite future date and by treating any loss suffered by him as a capital rather than an ordinary loss, inhibit the use of stock surrenders to the corporation as a means of improving the financial condition and attractiveness to investors of an ailing enterprise. A "fragmented" treatment of the transaction, on the other hand, may go too far in the opposite direction by giving the surrendering taxpayer an undeserved and illogical tax advantage. If he were to sell or exchange his shares instead of surrendering them to the corporation, or if he were to wait until they became completely worthless, his loss would be a capital one, not fully deductible against ordinary income under the 1954 Act. I.R.C. § 1211. However, since he receives nothing for the surrender, any loss resulting from the transaction cannot be treated as a capital one resulting from a "sale" or "exchange" as those terms are used in the Act. I.R.C. §§ 165(f), 1211. The Tax Court has therefore permitted him in the past to treat the loss as an ordinary one, giving him the advantage of the more favorable treatment. This, in turn, poses the risk that the surrender method may be used for the purpose of gaining an unusual tax benefit rather than to enhance the value of the corporation. Moreover, even if the loss were to be limited to the taxpayer's original investment less the present value of the surrendered stock, a solution which would reflect in part both the Commissioner's and the taxpayer's concerns, the parties would face the difficult practical problem in cases such as the present one (which involves a closed, non-public corporation in deteriorating financial condition) of ascertaining the value of the surrendered shares.

As indicated above, the foregoing dilemma cannot be resolved in the present case by treating the taxpayer's surrender of preferred stock to ABL as a sale or exchange, which would enable the taxpayer to take a capital loss on the difference between the cost basis of the surrendered stock and its current value, and by holding the present value of the surrendered stock to be a capital contribution. Treatment of a unilateral, non-reciprocal surrender as a

"sale or exchange" would defy the ordinary meaning of those terms. *Helvering v. Flaccus Leather Co.*, 313 U.S. 247, 249, 251, 61 S.Ct. 878, 879, 880, 85 L.Ed. 1310 (1941); *Fairbanks v. United States*, 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855 (1939); *Pounds v. United States*, 372 F.2d 342, 348–51 (5th Cir.1967); *see* Note, *"The Elements of a Section 117 'Sale or Exchange'"* 53 Colum.L.Rev. 976, 990 (1953). Although the Tax Court held in *Downer v. Commissioner*, 48 T.C. 86 (1971), that a stock transfer by a shareholder holding more than 66% of the outstanding stock to an employee of the issuing corporation, designed to induce the employee to continue working for the company, gave rise to a capital loss, we are disinclined to rely upon it as a precedent here because surrenders of stock to an issuing corporation (as distinguished from transfers to third persons) have never been recognized as sales or exchanges. Moreover, the value of *Downer* as a reliable precedent has been eroded by Congress' enactment in 1969 of 26 U.S.C. § 83(h) and the IRS's adoption of Treas.Reg. § 1.83–6(d), which require that a transfer of stock by a shareholder to a third person for services to the corporation be treated as a contribution to capital. *See Tilford v. Commissioner, supra.* Lastly, since the 65% taxpayer in the present case controlled ABL, treatment of the taxpayer's surrender of stock to it as resulting in a loss from a sale or exchange would be barred by I.R.C. § 267. That statute disallows loss deductions from sale or exchanges between related parties, which are defined to include a corporation and a person holding 50% or more of its stock. *See McWilliams v. Commissioner*, 331 U.S. 694, 699, 67 S.Ct. 1477, 1480, 91 L.Ed. 1750 (1947).

In any event it is questionable whether a controlling stockholder who voluntarily surrenders stock to his corporation for the purpose of strengthening it but continues his control through stock retained by him, thereby benefiting from the surrender, necessarily suffers any recognizable loss at the time of the surrender. The taxpayer in the present case, for instance, surrendered his 13% non-voting preferred but retained his 65% voting common. The transaction may be likened to a redemption by a majority stockholder of part of his stock, which is not entitled to treatment as a sale or exchange giving rise to a gain or loss unless the redemption results in a substantial reduction in his interest in his corporation. I.R.C. § 302(b); Treas.Regs. § 1.302–2(c); *United States v. Davis*, 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970); Brodsky & Pincus, *The Case of the Reappearing Basis*, 34 *Taxes* 675, 675–77 (1956). Instead, the redemption price will be treated as a dividend and the basis of his surrendered shares will be added to his retained shares. Such a surrender is also similar to a pro-rata surrender because the proportionate ownership of the taxpayer remains substantially the same, and he reaps the benefits of the contribution. *See Hadley, supra.*

In the present case several circumstances persuade us that the Tax Court properly treated the taxpayer's non-pro-rata surrender of preferred stock as a non-deductible capital expenditure. The taxpayer here, upon surrendering his 13% interest in preferred stock, retained control of ABL through his 65% voting common stock interest in that corporation. Moreover, as in *Schleppy v. Commissioner, supra*, at 198, the taxpayer's net equity in the corporation was not substantially reduced after taking into account the extent to which it was increased in value as a result of the surrender. Because the overall change in the taxpayer's interest in ABL was miniscule compared with the taxpayer's retained interest in the company, no justification exists for treating the change in value as a capital loss, much less as an ordinary one. To do so would enable a taxpayer, who acts voluntarily in making the surrender, to manipulate his holdings for tax advantages that would not be available if he sold his shares without any such interlocking of his equity interests in the corporation. The surrender was properly treated by the Tax Court as a contribution to the capital of ABL, as it had expressly been labelled by

the parties at the time of the surrender. Accordingly, we affirm the Tax Court's decision with respect to the surrender of the preferred stock. Our holding in this case, however, should not be construed as governing surrenders by a stockholder of more substantial equity interests that could truly be viewed as resulting in an immediate loss.

■ The taxpayer's cancellation of $158,600 in prior advances to ABL presents less of a problem than that confronted with respect to the surrender of the preferred stock. Although the taxpayer now urges that the advances be classified as "equity," they were labelled as "loans from shareholders" in ABL's books and as "advances" in a U.C.C. financing statement filed by the taxpayer. 83 T.C. at 167. Moreover, the May 4, 1973 and November 9, 1973, agreements between the taxpayer and ABL described the cancellations as a "contribution ... to capital." *Id.*, at 169. The Tax Court noted that the Commissioner was "fully justified in treating the advances as loans." *Id.*, at 173, n. 7. Accordingly, we agree with the Tax Court that the cancellations were not deductible as losses but represented contributions to the capital of ABL. *See Commissioner v. Idaho Power Company, supra; Perlman v. Commissioner, supra; Eskimo Pie Corp. v. Commissioner, supra.*

■ The taxpayer's remaining contention, that the Tax Court erred in holding that the taxpayer could not take an ordinary loss up to $50,000 under I.R.C. § 1244 on the December 1973 sale of the common stock of ABL at a loss of $142,000, needs little discussion. Here the deductibility of $50,000 as an ordinary loss was precluded by evidence adduced by the Commissioner demonstrating that the aggregate amount ABL could receive over the years for issuance of its stock and previous years exceeded $500,000. The company was not, therefore, a "small business corporation" as defined in I.R.C. § 1244(c)(2)(A) and its stock was not "§ 1244" stock. *Godart v. Commissioner*, 51 T.C. 937, 944 (1969), *aff'd on other grounds*, 425 F.2d 633 (2d Cir.1970). Moreover, if the taxpayer's contention that the $500,000 referred to in the plan included past amounts received is accepted, then the plan failed to state specifically the maximum amount to be received by it as consideration for the "Section 1244 stock" to be issued, as required by Treas. Regs. § 1.1244(c)-1(f)(1)(i). The Commissioner therefore sustained his burden of proof on the issue.[4]

The decision of the Tax Court is affirmed.

WINTER, Circuit Judge, concurring in the result:

My disagreement with Judge Mansfield's thoughtful opinion lies in my preference for a clear cut rule affording a degree of future certainty rather than a narrow ruling restricted to these particular facts.

The issue in this case poses a dilemma with no apparent solution that meets fully both logical and legal criteria. Judge Mansfield's opinion neatly describes this dilemma and the solutions offered by the parties. However, it declines to adopt either the position of the taxpayer—a non-pro rata surrender of stock leads to an ordinary loss—or the position of the Tax Court—such a surrender, when intended to increase the value of a taxpayer's remaining shares, is recognized (as a capital loss) only when the remaining shares are disposed of. Rather, the majority holds that there is no ordinary loss when a non-pro rata surrender of stock does not have an impact of some undefined magnitude on the taxpayer's interest in the corporation.

The holding thus suggests that the particular facts of this case are the key to the decision. It is, however, ambiguous as to

---

**4.** Taxpayer also contends that the Tax Court had no power to depart from its earlier rulings on stock surrenders, *see* cases cited *supra*, at 1709–10. While it is true that courts should be reluctant to depart from long-standing interpretations of tax law, *see United States v. Byrum*, 408 U.S. 125, 135, 92 S.Ct. 2382, 2389, 33 L.Ed.2d 238 (1972), the issue is one of first impression for this Court and our decision conflicts with no rule of stare decisis.

which facts are dispositive and as to whether the effect of a surrender of stock on the taxpayer's interest in a corporation must be quantitative in the sense of dollar value surrendered or qualitative in the sense of diminution or loss of control. This ambiguity is aggravated because the Tax Court failed to make findings that were at the time irrelevant in view of existing precedent but are essential to the majority's disposition.

There are thus no findings as to the dollar value of the taxpayer's surrender or the corporation's resulting gain. Whether the dollar value is small or large, however, the taxpayer bore 100% of the loss and got at best 65% of the gain. I say "at best" because the 65/35 division almost certainly overstates the potential benefits to the taxpayer. If the corporation were to experience a modest turnaround, dividends on the remaining preferred would have first priority. The taxpayer's surrender of his preferred shares in fact ensures that he would not have shared in any gain absent the corporation's encountering outright prosperity. Moreover, the preferred stock in this case was convertible, and those conversion rights further decreased the potential for gain on the taxpayer's part. Finally, we do not know what other rights the preferred stock had which might impinge on the taxpayer's control. It is noteworthy, I believe, that others declined to surrender their preferred shares as a means of resuscitating the corporation. The majority does not seem to me to spell out why this loss is legally of no consequence or what kind of loss would lead to a different result.

However, the majority is quite right in noting that the position urged by the taxpayer enables shareholders to utilize non-pro rata surrenders of stock to gain tax advantages not available through a sale of shares. I would respectfully add the observation that the actual dollar value of such surrenders will almost always be disproportionate to the proposed ordinary loss. If so, however, we would do everyone a favor simply by affirming on the rationale adopted by the Tax Court and thus avoid much future litigation over the magnitude of impact of particular surrenders of stock. I therefore concur in the result.