T.C. Memo. 1997-386

UNITED STATES TAX COURT

ROBERT R. PLANTE AND MARY B. PLANTE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24341-95.                    Filed August 25, 1997.

Thomas A. Lawler, for petitioners.

Albert B. Kerkhove, for respondent.

MEMORANDUM OPINION

CARLUZZO, Special Trial Judge:  This case was heard pursuant
to the provisions of section 7443A(b)(3) and Rules 180, 181, and
182.  Unless otherwise indicated, section references are to the
Internal Revenue Code in effect during the relevant year.  Rule
references are to the Tax Court Rules of Practice and Procedure.

In a notice of deficiency issued to petitioners on September 27, 1995, respondent determined a deficiency in their 1992 Federal income tax in the amount of $8,849. The issue for decision is whether petitioners are entitled to a net operating loss carryover deduction for the year 1992. The resolution of this issue depends upon whether petitioners suffered a net operating loss for the year 1991, which in turn depends upon whether petitioners are entitled to a business bad debt deduction for that year, claim for which was made for the first time in the petition.

Background

Petitioners filed a joint Federal income tax return for the year 1992. At the time that the petition was filed they resided in Cumming, Georgia. References to petitioner are to Robert R. Plante.

After his graduation from Harvard University in 1962, petitioner worked for various companies in the packaging industry, including Boise Cascade, Continental Can, and Maryland Cup Corp. At the time petitioner was employed by Maryland Cup Corp. petitioners lived in the Baltimore, Maryland, area. When Maryland Cup Corp. announced plans to relocate to Green Bay, Wisconsin, petitioner rather than transfer, resigned from the company with the intent to invest in and manage a marina business.

On March 31, 1987, petitioner acquired an operating marina business located on the Middle River in Essex, Maryland, a suburb of Baltimore.  The purchase date and conflicting evidence as to the form of the sale are the only details of this transaction that have been placed in the record.[1]  At the time of the purchase, or shortly thereafter, petitioner incorporated Boating Center of Baltimore, Inc. (BCBI or the corporation).  Petitioner paid $25,000 for 5,000 shares of common stock of BCBI, which represented all of the corporation's issued and outstanding stock.  On April 3, 1987, petitioner transferred all of the assets of the marina to BCBI.  From the date of its incorporation through December 20, 1991, petitioner was president and sole shareholder of BCBI.  Petitioner entered into an agreement to sell his interest in BCBI, as discussed in more detail later in this opinion, on December 20, 1991.

On March 31 and October 15, 1987, petitioner advanced $275,000 and $45,000, respectively, to BCBI.  Each transaction is evidenced by a promissory note (the notes) and a resolution adopted by BCBI's board of directors authorizing the corporation to accept the terms and conditions set forth in the relevant promissory note.  The notes were signed by petitioner as

---

[1]The parties stipulated that petitioner "purchased the assets of an existing marina".  Petitioner's direct testimony suggests that he purchased the stock of the corporation that owned and operated the marina.  We proceed as though the stipulation accurately describes the transaction.

president of BCBI, and the corporate resolutions were signed by petitioner as the sole member of BCBI's board of directors. The funds advanced by petitioner on both occasions were used for BCBI's current operating expenses.

Except for the amounts and due dates, the terms and conditions of the notes are identical. Each refers to petitioner as the lender and BCBI as the borrower. The advances are characterized as loans from petitioner to BCBI with principal and interest (prime rate plus 2 percent computed quarterly) due in 1 year from the date of the note. Each note was renewable at the option of petitioner (as the lender). If BCBI defaulted on any term of the notes, became insolvent, filed a bankruptcy petition, or had a receiver appointed, the notes would become immediately due and payable in full. Neither note was fully paid as of its due date. The notes were not renewed, and the repayment periods were not extended.

Petitioners reported interest income from BCBI on their joint Federal income tax returns as follows:

| Year | Amount |
|------|--------|
| 1987 | -0- |
| 1988 | -0- |
| 1989 | $39,102 |
| 1990 | 35,236 |
| 1991 | 20,599 |

Although less than clear from the record, it appears that from time to time prior to December 20, 1991, petitioner, or

petitioners, advanced other funds considered by them to constitute loans, to BCBI.  Some of the interest referred to in the above table may relate to these other unspecified transactions, and the balance presumably relates to the notes. Aside from the two notes previously described, petitioners presented no documents evidencing additional loans made by either of them to BCBI.

Uncertified financial statements prepared by BCBI's certified public accountants reflect, among other things, long-term liabilities to petitioner as follows (year references are to fiscal years ended October 31):

| Year | Liability |
|------|-----------|
| 1987 | $320,000 |
| 1988 | 396,750 |
| 1989 | 392,409 |
| 1990 | 419,069 |
| 1991 | 491,243 |

No explanation of, or accounting for, the changes in the amount of the liability from year to year has been provided.  We cannot tell whether the above amounts include principal and interest. Comparing the amount of liability for each year to the face amounts of the notes makes it obvious that, after October 31, 1987, the liabilities are not attributable exclusively to the notes.  A statement included in BCBI's financial statement for its fiscal year ended October 31, 1988, indicates that the liability with respect to that year relates to "unsecured notes

payable to stockholder * * * due in 1997 bearing interest at 10% per annum, payable monthly."  But for this reference, the record does not contain any evidence of notes fitting that description or loans from petitioners to BCBI under such terms.

As indicated, having resigned his position with Maryland Cup Corp., petitioner intended to participate actively in the marina business.  Consistent with this intent, petitioners were employed by BCBI from 1987 through 1991 and received the following compensation:

| Year | Petitioner | Mary B. Plante |
|------|------------|----------------|
| 1987 | $39,000 | $3,900 |
| 1988 | 33,000 | 5,100 |
| 1989 | -0- | 1,800 |
| 1990 | 1,500 | -0- |
| 1991 | 38,000 | -0- |

Although petitioner intended to make a career out of the marina business, his intentions were frustrated by the operating losses suffered by BCBI.  In order to minimize his loss with respect to his investment in BCBI, petitioner decided to sell his interest in the corporation.

BCBI was listed for sale for $2.25 million through a broker, who in August or September 1991 identified Douglas and Kay Hansen as prospective purchasers.  After preliminary negotiations, petitioner indicated that he would be willing to accept $1,050,000 from the Hansens for his interest in BCBI.

On December 20, 1991, petitioner and his attorney met with the Hansens and their attorney. After extended discussions, petitioner entered into a stock purchase agreement (the agreement) wherein he agreed to sell his interest in BCBI to the Hansens for $1,050,000 ($300,000 in cash, payable at various dates, and a note from the Hansens and BCBI in the amount of $750,000). The purchase price was allocated as follows: $575,000 for all issued and outstanding stock of BCBI; $100,000 for petitioner's covenant not to compete; $75,000 for consulting services to be provided by petitioner as described in the agreement; and $300,000 for the assumption of a lease and assignment of petitioner's option to purchase certain land near the marina.

During the meeting that took place on December 20, 1991, Mr. Hansen learned about petitioner's outstanding advances to BCBI, which at the time amounted to $475,000. Apparently, Mr. Hansen was unaware that BCBI's books reflected a liability to petitioner, and he insisted that any debt owed to petitioner be eliminated. Petitioner and the Hansens reached an understanding as to how the outstanding advances were to be treated, as reflected in the following paragraphs in the agreement:

> The shareholder, as the sole Shareholder and as President of the Corporation, hereby makes the following representations and warranties which shall survive the Closing Date;

> Shareholder has transferred Four Hundred Seventy-Five Thousand ($475,000.00) Dollars of notes and accrued interest of the Corporation due Shareholder as of 11/1/91 to the equity account of the Corporation and has made this an irrevocable capital contribution to the Corporation.  The notes, accrued interest and capital lease due Shareholder as of the Closing have been tendered to Buyer in exchange for Buyer notes.

Petitioner wrote "PAID IN FULL" and the date of "12-20-91" on each note.

Petitioners' 1991 Federal income tax return (the 1991 return) was prepared by Russell Marshall, a certified public accountant.  Mr. Marshall advised petitioner that the transaction in which petitioner transferred his interest in BCBI to the Hansens resulted in a long-term capital loss, only a portion of which was currently deductible.  On the Schedule D attached to their 1991 return, petitioners reported a basis of $1,743,492 in the BCBI stock and reported a long-term capital loss of $693,492 from its sale.[2]  Petitioners deducted $3,000 of this loss and treated the remaining portion as a long-term capital loss carryover to 1992.

On March 26, 1993, petitioners filed an amended 1991 return. On the amended return, petitioners treated the BCBI stock as small business stock defined by section 1244 and claimed an

---

[2]In preparing petitioners' original and amended 1991 Federal income tax returns, the allocation schedule in the agreement was obviously ignored, and petitioners reported the transaction as though the entire purchase price was attributable to the sale of BCBI stock.  See infra note 3.

ordinary loss of $693,492 from the sale of such stock.  Also on amended returns, a net operating loss in the amount of $655,191 was carried back to 1988, and then forward into 1989 and 1990, in the amounts of $601,814 and $591,629, respectively.

On their 1992 Federal income tax return, petitioners claimed a net operating loss carryover deduction in the amount of $587,581, the source of which is not readily identifiable on the return, but apparently relates to the sale of petitioner's BCBI stock.  Petitioners' amended returns for the years 1988 through 1991, all of which claimed refunds, and their 1992 return were prepared by Thomas A. Lawler, Esq., who is also their counsel of record in this case.

In the notice of deficiency, respondent determined that petitioner suffered a loss of $693,492 ($1,743,793 basis, minus $1,050,000 realized) on the sale of his BCBI stock and further determined, pursuant to section 1244, that petitioners were limited to an ordinary loss deduction of $100,000 in 1991 from the transaction.[3]  Respondent treated the balance of the loss

[3] It would appear that respondent was unaware of or disregarded the allocation schedule in the agreement, potentially allowing petitioners (at least with respect to the amounts attributed to the covenant not to compete and consulting services) to offset ordinary income by long-term capital loss in excess of the amounts otherwise allowable under sec. 1211(b).  We cannot tell at this point whether treating the sale of petitioner's option in the real estate as though it were inherently part of the sale of his BCBI stock worked to petitioners' advantage or disadvantage for Federal income tax

(continued...)

($593,492) as a long-term capital loss, allowed a $3,000 capital loss deduction in 1991, and treated $590,492 as a long-term capital loss carryover from 1991 to 1992. Consistent with this treatment of the transaction in 1991, respondent determined that petitioners had a net operating loss of $61,698 for that year. After carrying the net operating loss back to 1988 and forward to 1989 and 1990, respondent determined that the loss had been extinguished prior to 1992. As a result of the foregoing, respondent disallowed the net operating loss carryover deduction of $587,581 claimed by petitioners in 1992, which disallowance results in the issue here in dispute. Other adjustments made in the notice of deficiency are computational in nature and will be resolved automatically with the resolution of the disputed issue.

Discussion

Although not specifically addressed by either party, there appears to be agreement between them on the following points. First, the BCBI stock in the hands of petitioner constituted a capital asset as defined by section 1221. Except as provided by section 1244, because of the period that petitioner held the

---

[3](...continued)
purposes. In this regard it should also be noted that the parties stipulated that in the agreement petitioner "agreed to sell all of the issued and outstanding shares of stock of * * * [BCBI] for $1,050,000" which does not accurately describe the transaction, but is consistent with the positions taken on petitioners' original and amended 1991 returns and in the notice of deficiency.

stock any loss that resulted from its sale or disposition would be treated as a long-term capital loss. Secs. 1222 and 1223. Secondly, the parties agree that petitioner suffered a loss on the sale of his BCBI stock (the resolution of the issue here under consideration could have an effect on the amount of the loss; otherwise there is no dispute between the parties on the point). Lastly, the parties apparently agree that petitioner's BCBI stock constituted small business stock within the meaning of section 1244(c), subject to the provisions of section 1244(a) and (b), which under the circumstances of this case would allow petitioners to treat $100,000 of the loss sustained on the sale of the stock as an ordinary loss. In this regard we note that petitioners' treatment of the transaction on their 1991 amended return (treating the entire loss as ordinary) is patently incorrect and inconsistent with section 1244, which as indicated allows for only a limited amount of the loss to be treated as ordinary. Sec. 1244(b)(2). From the allegations in the petition and the arguments in petitioners' brief, we assume that petitioners have recognized their error on this point, and now support their claim for a 1992 net operating loss carryover deduction upon the theory that they were entitled to a previously unclaimed bad debt deduction in 1991.

In general, section 166 allows a taxpayer a deduction for any debt that becomes worthless within the taxable year. Sec.

166(a). To justify a deduction under section 166, petitioners must establish that a bona fide debt existed. Sec. 1.166-1(c), Income Tax Regs. A bona fide debt arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A shareholder's contribution to the capital of a corporation is not considered a debt for purposes of section 166. Sec. 1.166-1(c), Income Tax Regs; see United States v. Uneco, Inc. (In re Uneco, Inc.), 532 F.2d 1204, 1207 (8th Cir. 1976); Kean v. Commissioner, 91 T.C. 575, 594 (1988).

Characterization of an advance by a shareholder to a corporation as either a loan (debt) or contribution to capital (equity) is a question of fact that can be resolved only by reviewing the circumstances surrounding the transaction. Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).

In reviewing the surrounding circumstances of such transactions, the following factors should be considered: (1) The name given to the certificate evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result of the advance; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest

between creditor and stockholder; (10) the source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement. Estate of Mixon v. United States, 464 F.2d 394 (5th Cir. 1972); see also Lane v. United States (In re Lane), 742 F.2d 1311 (11th Cir. 1984); Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634 (11th Cir. 1984), affg. T.C. Memo. 1982-314.

A shareholder/taxpayer seeking to treat an advance to a corporation as a loan bears the burden of proof on the point, Rule 142(a); Dixie Dairies Corp. v. Commissioner, supra, as do petitioners in this case. Transactions between a shareholder and a closely held corporation require special scrutiny. Gilboy v. Commissioner, T.C. Memo. 1978-114.

Taking into account the above factors, we first consider whether the $475,000, or any portion thereof, constituted a loan, or loans, for Federal income tax purposes. Petitioners contend that as of December 20, 1991, the entire $475,000 represented a worthless bona fide debt, within the meaning of section 166(a)(1), owed to petitioner from BCBI. They further argue that no part of the debt constitutes a nonbusiness debt within the meaning of section 166(d), and therefore they are entitled to a business bad debt deduction in the amount of $475,000 for the

year 1991 that ultimately results in a net operating loss carryover deduction for the year 1992; respondent disagrees on virtually every point. Neither party makes a distinction between the portion of the $475,000 in unpaid advances represented by notes and the remaining portion.[4]

But for the advances evidenced by the notes, there is little, if any, evidence in the record regarding the details of any other transaction(s) that account for the $155,000 difference between the face value of the notes and the stipulated amount of the unpaid advances. As we have often stated, deductions are a matter of legislative grace. A taxpayer who claims a deduction must identify the specific statute that allows for the deduction and demonstrate that all of the requirements of the statute have been satisfied. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Having provided the Court with virtually no information regarding $155,000 of the amount here in dispute, petitioners have failed to establish that the requirements of section 166 have been satisfied with respect to that amount. On

---

[4]The parties stipulated that as of Nov. 1, 1991, "the petitioner had unpaid advances to the corporation totaling $475,000". The preamble to the stipulation states that respondent "does not stipulate and agree by the use of the terms 'note,' 'loan,' or 'advance' in this stipulation or annexed exhibits that amounts paid to or on behalf of * * * [BCBI] by petitioner * * * constituted loans for federal income tax purposes."

the basis of the record before us, we have no choice but to deny their claim to the deduction, at least to the extent of $155,000, and turn our attention to the portion of the deduction represented by the notes.

Narrowing our focus on the treatment of the notes in connection with disposition of petitioner's BCBI stock leads us to conclude that the balance of petitioners' claim for a bad debt deduction (the amount represented by the notes) must also be rejected.

Assuming, without finding, that the advances evidenced by the notes represent bona fide loans from petitioner to BCBI, it is clear that the underlying "debt" was satisfied, "paid", canceled, or forgiven in connection with petitioner's sale of his stock to the Hansens. The agreement clearly makes the disposition of the notes part of the sale transaction and characterizes their disposition as a contribution to BCBI's capital. Petitioners have presented us with nothing that suggests otherwise. Petitioners' argument that the amount evidenced by the notes should now result in a section 166 bad debt deduction is inconsistent with the nature of the underlying transaction. Respondent's arguments regarding the application of Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), revg. 44 T.C. 549 (1965), notwithstanding, petitioners have presented no evidence that attempts to recharacterize the nature of the

agreement between petitioner and the Hansens.  The fact is that petitioner canceled, or otherwise considered satisfied, any debt owed to him by the corporation as part of his agreement with the Hansens.  It was characterized as contribution of capital in the agreement, and there is no basis in fact for considering it otherwise for Federal income tax purposes.

Furthermore, a shareholder's cancellation or forgiveness of any debt owed to the shareholder from the shareholder's closely held corporation is generally considered a contribution to the corporation's capital, which is what occurred in this matter. Lidgerwood Manufacturing Co. v. Commissioner, 229 F.2d 241 (2d Cir. 1956), affg. 22 T.C. 1152 (1954); Bratton v. Commissioner, 217 F.2d 486 (6th Cir. 1954); Frantz v. Commissioner, 83 T.C. 162 (1984), affd. 784 F.2d 119 (2d Cir. 1986); sec. 1.61-12(a), Income Tax Regs.  But cf. Giblin v. Commissioner, 227 F.2d 692 (5th Cir. 1955), revg. T.C. Memo. 1954-186.  A creditor's voluntary forgiveness of a debt ordinarily does not provide sufficient grounds for claiming a bad debt deduction.  See W.D. Haden Co. v. Commissioner, 165 F.2d 588 (5th Cir. 1948); Thompson v. Commissioner, 6 T.C. 285 (1946), affd. 161 F.2d 185 (5th Cir. 1947).  Accordingly, petitioners are not entitled to a bad debt deduction for 1991 to the extent of the amount of debt evidenced by the notes, or, as previously indicated, for the unexplained balance of the $475,000.

Because petitioners are not entitled to a bad debt deduction for the year 1991, it follows, and we hold, that petitioners are not entitled to the net operating loss carryover deduction here in dispute.

To reflect the foregoing,

<u>Decision will be</u>

<u>entered for respondent</u>.